805 F.2d 1133
 George M. BROWN, II, Appellee,
v.
The BALTIMORE AND OHIO RAILROAD COMPANY, Appellee,
v.
CAMILLO IACOBONI & SONS, INC.; Baltimore County, Maryland,
Appellants.
George M. BROWN, II, Appellee,
v.
The BALTIMORE AND OHIO RAILROAD COMPANY, Appellant,
v.
CAMILLO IACOBONI & SONS, INC.; Baltimore County, Maryland, Appellees.
 Nos. 85-1232, 85-1233.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 7, 1986.
Decided Nov. 18, 1986.
 
 Alfred L. Scanlon, Jr., Baltimore, Md. (Marc Seldin Rosen, Whiteford, Taylor, Preston, Trimble & Johnson, William J. Wiseman, III, Baltimore, Md., on brief), for appellants/cross-appellees.
 George F. Pappas, Baltimore, Md. (H. Russell Smouse, Neile Sue Friedman, Melnicove, Kaufman, Weiner & Smouse, P.A., C. Keith Meiser, Baltimore, Md., on brief), for appellee/cross-appellant The Baltimore and Ohio R. Co.
 Richard R. Beauchemin, Baltimore, Md. (Geoffrey J.C. Boyd, Morris N. Tingle, Arnold Beauchemin & Tingle, P.A., Baltimore, Md., on brief), for appellee George M. Brown, II.
 Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 In this action under the Federal Employers' Liability Act (FELA), 45 U.S.C. Sec. 51 et seq., brought by George M. Brown, Jr., a brakeman employed by the Baltimore & Ohio Railroad Company (B & O), a jury found the B & O and Camillo Iacoboni & Sons, Inc. (Iacoboni), jointly and severally liable for personal injuries sustained by Brown when a B & O train struck an earth moving machine owned by Iacoboni that had been placed by unknown third persons on the B & O tracks. The B & O, in turn, was awarded a judgment for indemnification as to its liability on a third-party claim against Baltimore County pursuant to a contractual agreement. On separate appeals by the B & O, Iacoboni, and Baltimore County, we affirm the judgment against the B & O, reverse that against Iacoboni, and affirm that against Baltimore County.
 
 
 2
 * In 1978, B & O agreed to allow Baltimore County to install a sewer line beneath its railroad tracks in the Rossville, Maryland area. A "Pipeline Crossing Agreement" was entered into by the parties, permitting the County to "install, operate and maintain one 12-inch DIP sewer pipe line together with necessary casing, vents, fixtures and appurtenances thereto, hereinafter referred to collectively as 'Crossing,' upon, under and across the land and under the tracks of the Railway at a point located ... at Valuation Station 4520 plus 00, ... at Rossville, ... Maryland." Baltimore County paid B & O $500 as consideration for this agreement, which further provided that the County would indemnify B & O against any loss or liability sustained by the railroad on account of personal injury, death, or property damage "arising out of or in any manner connected with the location, installation, existence, operation, maintenance, renewal, changing, alteration, relocation or removal of said Crossing, regardless of whether such death, injury, damage or destruction shall be caused by the negligence of the Railway or otherwise."
 
 
 3
 Baltimore County thereafter contracted with Iacoboni to perform the Rossville sewer line work, which commenced in May 1979. The evidence indicated that on the day of the accident, a Caterpillar 930 earth-mover (CAT 930) was parked by Iacoboni employees between 30 and 100 feet from the pipeline crossing in an isolated area surrounded by trees. Iacoboni's foreman testified at trial that before leaving the worksite that day, he personally confirmed that padlocks securing the machine's doors, engine compartment, and fuel tank were secure. The heavy gauge padlocks, which were secured by hasps welded to the machine, had been specially ordered by Iacoboni after another CAT 930 was stolen from the Rossville site and driven into a nearby stream nine months earlier. There was undisputed evidence at trial that, following the first episode of vandalism, Iacoboni had hired a professional security guard to monitor the equipment, at least until the padlocks were installed. There was also evidence that one of the three teenagers involved in that earlier incident was ordered by a juvenile judge to act as a night watchman on the work site until the project was completed, although no one guarded the earth-mover on the day of the accident. Iacoboni's foreman also testified that the machine could be started with any of thousands of identical CAT 930 keys but doubted whether this particular three- or four-year-old machine might also be started using two nails, as was the case with certain older models.
 
 
 4
 The train's engineer, Ronald George, testified that at the time of the accident (7:15 p.m.), visibility of the tracks ahead was between one and two miles and that the train could, and in fact did, make an emergency stop within a quarter mile of application of the brakes. Both George and Brown testified that they had a short conversation about sharing a can of soda just before they saw the CAT 930 on the tracks ahead.
 
 
 5
 The engineer testified that when he saw the CAT 930 he immediately applied the emergency brakes and "hit the deck," although he had first considered jumping out. Railroad safety rules prohibit jumping from a moving train unless "necessary in the performance of duty." The engineer was essentially unharmed by the accident. Although Brown claimed at trial that he could not remember how or why he left the train, the engineer testified at trial that he believed that just before impact Brown had exclaimed that he intended to jump; the treating physician's report indicated that Brown had explained that he had jumped from the train; and, in his complaint, Brown specifically alleged that he had jumped. Brown suffered a broken right leg and various facial lacerations.
 
 
 6
 Brown originally sued only the B & O under the FELA. The B & O in turn asserted third-party claims against Iacoboni as a joint tortfeasor liable over to the B & O for full indemnification or contribution for its primary or concurrent negligence under Maryland law, and against Baltimore County for full indemnification under the contractual agreement between the B & O and Baltimore County. Brown then amended his complaint to add Iacoboni as a defendant on the main claim. The case went to trial to a jury on Brown's main claim against the B & O and Iacoboni, and the B & O's cross-claim against Iacoboni for indemnification or contribution under state law, and to the court on B & O's third-party claim for contractual indemnification against Baltimore County under state law.
 
 
 7
 After the district court denied motions by the B & O and Iacoboni for directed verdicts on Brown's claim, the jury returned a verdict of $300,000 for Brown against the B & O and Iacoboni as joint tortfeasors and a verdict for the B & O on its cross-claim for contribution against Iacoboni. The court in turn, sitting without a jury, entered judgment for the B & O against Baltimore County on the former's contractual indemnification claim.
 
 
 8
 These appeals, by the B & O, Iacoboni, and Baltimore County respectively, followed.
 
 
 9
 B & O and Iacoboni separately challenge the district court's dismissal of their respective motions for directed verdict, asserting that there was not sufficient evidence of the actionable negligence of either to warrant submission of Brown's claims to the jury. Baltimore County challenges the district court's enforcement of the contractual indemnification agreement under the facts of the case. Finally, the B & O contends that a mistrial should have been declared because of a prejudicially improper jury argument by Brown's trial counsel.
 
 
 10
 We take these contentions in order.
 
 II
 
 11
 We consider first the sufficiency of the evidence to support the jury verdict against the B & O.
 
 
 12
 In an FELA action, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957). The evidence here amply supports, under this most lenient standard of proof, a jury finding that B & O's negligence played some part in producing Brown's injuries. The railroad itself specifically charges its engineers to keep "a vigilant lookout in the direction moving." George, B & O's engineer, testified that his visibility at the time of the accident was between one and two miles and that he was able to stop the train within a quarter mile after applying the brakes. Given such evidence, a jury reasonably could infer that B & O's engineer failed to "lookout" for and thus avoid the three- to four-ton earth-mover although, by his own testimony, it was visible from a distance at which the collision could have been prevented.
 
 
 13
 B & O contends that it "could not reasonably have anticipated that an unknown third party would flagrantly disregard the criminal laws and plain common sense and place a heavy piece of earth moving machinery directly in the path of a moving train." Perfect foresight, however, is not an element of the legal duty of care here in issue. See Restatement (Second) of Torts Sec. 435(1) (1965) ("If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable."). Given its "vigilant lookout" rule, B & O cannot seriously contend that the risk of an obstruction on its tracks in general represents an unanticipated hazard or that injuries caused by an engineer's failure to keep a lookout are not foreseeable. Under the inferable circumstances of the obstruction's visible presence on the tracks, the means by which it was placed there were essentially irrelevant to the duty to see it in time to avoid collision.
 
 
 14
 The district court therefore properly denied the B & O's motion for directed verdict.
 
 III
 
 15
 Turning to the sufficiency of the evidence to support a jury finding of Iacoboni's negligence, however, we conclude that the district court erred in failing to direct verdicts in favor of Iacoboni on Brown's main claim and the B & O's dependent cross-claim for contribution.
 
 
 16
 Maryland state law, not the FELA, of course supplies the substantive standard by which Iacoboni's asserted liability in negligence is to be determined. That law, of course, imposes no such strict duty of care as does the FELA. In the specific factual context of this case, indeed, we are satisfied that, as a matter of Maryland law, Iacoboni's conduct could not be found negligent.
 
 
 17
 The negligence charged to Iacoboni, is, simply put, its failure to protect Brown against the risk of physical harm traceable ultimately to the conduct of the unknown persons who put Iacoboni's equipment on the B & O tracks.
 
 
 18
 Under Maryland law, as generally, a duty of care to protect against conduct of others may exist in some circumstances, but those circumstances are, for obvious reasons, narrowly circumscribed.
 
 
 19
 The Maryland standard applicable to this general factual situation is, as specifically adopted by the highest Maryland courts, that of Sec. 315 of the Restatement (Second) of Torts:
 
 
 20
 There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
 
 
 21
 (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
 
 
 22
 (b) a special relation exists between the actor and the other which gives to the other a right to protection.
 
 
 23
 Cited in Lamb v. Hopkins, 303 Md. 236, 492 A.2d 1297, 1300 (App.1985); Henley v. Prince George's County, 60 Md.App. 24, 479 A.2d 1375, 1381 (1984); Scott v. Watson, 278 Md. 160, 359 A.2d 548, 552 (App.1976).
 
 
 24
 Under this standard, if neither of the special relations it describes are present, an actor is not subject to liability if he fails, intentionally or through inadvertence, to control the actions of third persons in order to protect another from even the most serious harm. "This is true although the actor realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself." Restatement (Second) of Torts Sec. 315 comment b. Because, in this case, Iacoboni had no proven relationship with the unknown third persons responsible for moving its CAT 930 across the railroad tracks, and no "special relation" with Brown,[1] Iacoboni had no duty, under the rule, to prevent the conduct and thereby to protect Brown.
 
 
 25
 Brown and B & O nevertheless argue that because of the earlier incident of vandalism, Iacoboni owed a general duty to protect all persons, including Brown, from potential injury that might be caused, directly or indirectly, by third persons meddling with its equipment. A similar issue was addressed, on certification by a United States District Court, by the Court of Appeals of Maryland in Scott v. Watson, 278 Md. 160, 359 A.2d 548. In that case the plaintiff's decedent was murdered in the garage of the apartment building in which he resided. The defendant-landlord was aware of a rash of recent criminal activity in and around the apartments prior to Scott's death and had taken certain measures to enhance security in the building. One of the questions certified to the Maryland court was whether, notwithstanding the absence of a general duty to protect tenants from the criminal acts of third parties committed in common areas within the landlord's control,[2] such a duty should be imposed by reason of the landlord's knowledge of increasing criminal activity on the premises. 359 A.2d at 550. Noting that the general duty of a landlord to exercise reasonable care for the safety of his tenants in such common areas is "sufficiently flexible to be applied to cases involving criminal activity without making the landlord an insurer of his tenant's safety," id. at 554, the court held that although a landlord knows or should know of such prior crimes, his only duty is to take "reasonable measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity." Id. (emphasis in original).
 
 
 26
 The court went on to offer the "additional observation," although not directly responsive to any of the questions certified, that, even assuming a duty and its breach, the determination of proximate cause, also an essential element of negligence, "is subject to considerations of fairness and social policy as well as mere causation." Id. at 555. In the context of third party criminal activity, those considerations dictate that a breach of duty by the defendant should not result in tort liability unless the breach "enhanced the likelihood of the particular activity which occurred." Id. at 556 (emphasis added).
 
 
 27
 Applying these recently explained principles of state law to the instant case, we hold that, as a matter of law, Iacoboni took reasonable measures to prevent a second episode of vandalism. The uncontradicted evidence showed that following the initial incident Iacoboni installed windows as well as heavy gauge padlocks in the CAT 930 and hired a security guard to monitor the equipment at least until such precautions had been effected. In the intervening nine months, the teenagers responsible for stealing the first machine were apprehended and there was no further suggestion that the equipment, located in a swampy area two miles from the nearest dwelling, was vulnerable to vandalism. Under the circumstances, Iacoboni took reasonable measures to protect against the theft of and resulting damage to its CAT 930 earth-mover--the only risk of which it had prior notice--as well as any other kind of harm that might ultimately flow from such third party criminal intervention. Even if Iacoboni had breached its duty to take "reasonable measures," however, it cannot be said to have "enhanced the likelihood" of the criminal activity in this case. See Scott v. Watson, 359 A.2d at 556.
 
 
 28
 The rule for which the plaintiffs contend would come close to imposing upon contractors situated as was Iacoboni a legal duty, for indefinite periods of time, to provide round-the-clock security or other such extraordinary measures to protect their equipment if once it is vandalized. Such a rule would render persons owning such property virtual insurers of the safety of anyone who might conceivably be harmed by third persons who manage to gain access to such equipment, although locked against intruders. This is a result that we think has been found unacceptable as a matter of state tort law in similar circumstances. See Scott v. Watson, 359 A.2d at 554.
 
 
 29
 We express no opinion whether more recent or frequent vandalism, or other factors, might require a more extraordinary response by a contractor in Iacoboni's position. We hold only that in the circumstances of this case, Iacoboni took "reasonable measures ... to eliminate the conditions contributing to the criminal activity," Scott v. Watson, 359 A.2d at 554, and thus that the district court erred in denying Iacoboni's motion for a directed verdict.[3]
 
 IV
 
 30
 We consider next Baltimore County's contention that the district court erred in its interpretation and application of the contractual indemnity agreement under which the County was held liable to indemnify the B & O.
 
 
 31
 As indicated in our preliminary statement of facts, the contractual agreement bound Baltimore County broadly to indemnify the B & O against liability sustained on account of, inter alia, personal injury "arising out of or in any manner connected with the ... installation ... of [the described sewer crossing], regardless of whether such ... injury ... shall be caused by the negligence of the [B & O] or otherwise." Applying this provision to the facts here proven, the district court found that Baltimore County was bound to indemnify the B & O in respect of the B & O's established liability to Brown, and entered judgment accordingly.
 
 
 32
 In the district court and on this appeal, Baltimore County has challenged this legal ruling on three principal grounds, two related to interpretation of the indemnity agreement, and the third to the effect of a Maryland statute prohibiting indemnification in some circumstances.
 
 
 33
 The first contention is that, as a matter of contract interpretation, the indemnification agreement simply did not apply to the liability incurred by the B & O to Brown, because it was not "liability ... arising out of or in any way connected with the location, [or] installation ... of [the] crossing." Specifically, the argument is that all work on the "crossing" itself had been completed and paid for by Baltimore County some time before Brown was injured; that the injury was sustained some distance away from the crossing site; that Iacoboni's continued contract work on the sewer line at the time of Brown's injury was some distance away from and not upon the "crossing" itself; and that Iacoboni's equipment was parked some distance away. On this basis, Baltimore County argues, the B & O's liability to Brown did not "arise out of" nor was it "in any way connected" with the "location" or "installation" of the "crossing," as that feature was specifically defined and located in the agreement.
 
 
 34
 The B & O of course has contended for a broader reading of the critical language of the indemnity agreement. Without disputing the County's factual assertions about the spatial and temporal relation of the liability incident to the contract work on the "crossing," the B & O urges that the intended reach of the indemnity agreement was not limited spatially to occurrences at the precise physical location of the "crossing," nor to occurrences during the very installation of the crossing; that the key notion was instead that expressed in the phrases "in connection with" and "arising out of" "installation" of the "crossing," so that any occurrence on its right-of-way "connected" in any way with, or in any sense "arising out of," "installation" of the "crossing" was covered, without regard to its precise temporal, or spatial, or direct causal relation to actual construction work on the crossing itself.
 
 
 35
 The district court first ruled that this provision of the agreement was, as a matter of law, ambiguous on the disputed point. Addressing it therefore, as an issue of fact for resolution on evidence, including extrinsic testimonial evidence of the parties' intention, the court found, on the evidence adduced, in favor of the B & O's contention: that the agreement was intended to cover incidents such as that which gave rise to the B & O's liability to Brown.
 
 
 36
 We agree that, as a matter of law, the provision is ambiguous; and we cannot declare the court's consequent fact findings as to its intended meaning clearly erroneous. While both the intrinsic and extrinsic evidence of intended reach of the agreement might have supported a contrary finding, we cannot say that the court's ultimate finding is not a plausible one, see Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), and it must therefore stand.
 
 
 37
 The next contention respecting interpretation of the indemnity agreement relates to the fact that the incident for which the B & O was found liable was traceable ultimately to the criminal conduct of third persons, the unknown vandals who placed Iacoboni's equipment on the B & O's tracks. It is argued that the agreement nowhere explicitly refers to indemnity in such circumstances, and that in such a case, the provision should be construed against the B & O, as drafter of the agreement. The B & O's response is the simple one that the phrase "or otherwise," interpreted according to its plain meaning, does indeed include circumstances in which the conduct of third persons, even if criminal, is a causal factor.
 
 
 38
 The district court did not make a specific determination on this point, either in form of a conclusion of law or finding of fact. A determination against Baltimore County is of course, however, implicit in the ultimate conclusion that, on the facts proven, the indemnity agreement bound Baltimore County.
 
 
 39
 We are reluctant to attempt review and either to reject or uphold conclusions of law or findings of fact on dispositive issues when they can only be deduced as implicit in a resulting judgment. The ordinarily preferred course, equally reluctantly taken, is to remand for first instance determination of the issue by the district court. See Lewis v. Bloomsburg Mills, Inc., 773 F.2d 561, 577 (4th Cir.1985). Nevertheless, where, as here, the issue is narrow and specific, and the implicit determination clear beyond any doubt, we may yet review to avoid the expensive alternative of a remand for a practically assured pro forma express determination conforming to that one necessarily implicit in the judgment.
 
 
 40
 Reviewing the district court's implicit determination that the agreement was intended to require indemnification notwithstanding criminal intervention of third persons in the causal chain of events leading to indemnitee liability, we find no error. We think that, as a matter of law, applying the plain meaning canon of construction, the phrase "or otherwise" in context must be interpreted to include such circumstances. We therefore agree with the district court's implicit determination that the indemnity agreement was intended to cover the B & O's liability notwithstanding third party criminal intervention in the causal chain leading to indemnitee liability.
 
 
 41
 In sum, with respect to the two preceding contentions, we affirm the district court's interpretation that the indemnity agreement was intended to require indemnity for the liability incurred by the B & O to Brown. That leaves Baltimore County's final contention: that if the agreement was so intended, its application to the facts of this case was void under an express provision of Maryland statutory law.
 
 
 42
 Md.Cts. and Jud.Proc.Code Ann. Sec. 5-305 (1973) provides:
 
 
 43
 A covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relating to the construction, alteration, repair, or maintenance of a building, structure, appurtenance or appliance, including moving, demolition and excavating connected with it, purporting to indemnify the promisee against liability for damages arising out of bodily injury to any person or damage to property caused by or resulting from the sole negligence of the promisee or indemnity [sic], his agents or employees, is against public policy and is void and unenforceable. This section does not affect the validity of any insurance contract, workmen's compensation, or any other agreement issued by an insurer.
 
 
 44
 Baltimore County contends that under this provision the indemnity agreement is, in any event, void and that the district court therefore erred in enforcing it. The argument is that this indemnity agreement is one contemplated by the statute and that the statute specifically bars (makes "void") the indemnity claimed by B & O, in respect of its "liability ... resulting from" its "sole negligence." We disagree for the following reason.
 
 
 45
 We believe that the statute was not intended to apply to licensors or easement grantors such as the B & O who enter into railroad crossing indemnity agreements of this type.[4] By such agreements railroads have long and customarily sought protection against liability resulting or arising in any way from their grants, for a multitude of purposes, of easements or licenses to use or cross their rights of way. Those purposes sometimes involve mutual benefits to both railroad and licensee or grantee (as in siding easements), sometimes only benefit to the grantee (as in crossing easements). Whether the underlying benefits are mutual or unilateral, however, such agreements are critical to commerce given the necessity for vehicular crossings of various kinds and for shared commercial use of railroad rights of way. To construe this statute as curtailing railroads' traditional power to bargain in good faith for indemnity from their licensees or grantees whenever construction work by the grantee or licensee on the right of way is contemplated would therefore have serious public policy implications. We are satisfied that the legislature was necessarily aware of these and that the statute must be construed with this in mind.
 
 
 46
 Accordingly, while an expansive interpretation of the statute's phrase, "in, or in connection with or collateral to, a contract ... relating to ... construction" could be read to reach the railroad indemnity agreement here, we are satisfied that this could not have been the legislative intent. A consideration of the principal mischief sought to be avoided by the statute bears this out.
 
 
 47
 The obvious core purpose of the statute is to prohibit the parties to construction contracts--owners of property and their prime and sub-contractors--from avoiding by indemnity agreements all risks created by their own fault associated with contract performance.[5] The manifest public policy aim is to fix and maintain responsibility for safe performance of such high risk contracts upon those parties in a position to control performance--most obviously owners and contractors. A mere licensor or easement grantor, such as the B & O here, is not in a position by virtue of its property and contractual relationships with the parties to such a construction contract directly to control the incidents of the contract's performance (including, here, the safeguarding of construction equipment by one of the contracting parties). Hence we think the legislation could not have been intended to prevent mere licensors or easement grantors such as the railroad here--as distinguished most readily from the parties to the construction contract--from exacting indemnity from their licensees or easement grantees such as Baltimore County. The statute's concern, so far as this construction contract is concerned, would extend only to preventing the County as owner and Iacoboni as construction contractor from passing on to others the risks of their "sole negligence" in performing, or controlling performance of, their contract.[6]
 
 
 48
 We therefore hold, interpreting the statute as we believe the highest state court would, that the statute does not proscribe the B & O's indemnification claim against Baltimore County. Because, as earlier held, the indemnity agreement was properly interpreted by the district court as requiring indemnification under the facts of the case, we affirm the district court's judgment in favor of the B & O against Baltimore County.
 
 V
 
 49
 The B & O argues, finally, that the trial court abused its discretion in refusing to grant a mistrial after Brown's counsel suggested, in closing argument, that the jury should calculate damages for lost future wages, although no evidence of any diminution in Brown's earning capacity had been adduced at trial. We disagree.
 
 
 50
 At the bench conference on the B & O's motion for a mistrial, the trial court agreed that Brown's argument was improper but denied the motion on the basis that it would give a curative instruction to the effect that there was no evidence of diminished earning capacity. Accordingly, in its instructions to the jury, the trial court specifically charged that "there is no evidence in this case ... of any diminished earning capacity.... The evidence shows that [Brown] is working today and has continued to work since the accident, and no one presented any evidence of what might happen in the future. And you cannot speculate on that." Given the curative instruction, we hold that the trial court did not abuse its discretion in refusing to grant a mistrial based on improper closing argument by Brown.
 
 
 51
 AFFIRMED IN PART; REVERSED IN PART.
 
 
 
 [1]
 In the Restatement formulation, the relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are those between a common carrier and its passengers; an innkeeper and his guests; a possessor of land who holds it open to the public and members of the public who enter in response to his invitation; and one who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection and one in such custody. See Restatement (Second) of Torts Secs. 314A, 320 (1965)
 
 
 [2]
 The first question certified in Scott was whether Maryland law imposes upon a landlord a duty to tenants to protect them from the criminal acts of third parties committed in common areas within the landlord's control. 359 A.2d at 550. The court responded that landlords are under no such special duty under Maryland law, citing the general rule stated in the Restatement (Second) of Torts Sec. 315 that a private person is under no duty to protect another from criminal acts by third persons in the absence of a special relationship. Id. at 552
 
 
 [3]
 Because we hold that Iacoboni was not negligent, as a matter of law, we need not reach its contention that Brown's contributory negligence should bar his recovery against the contractor under Maryland law. The B & O concedes that the issue of contributory negligence was properly submitted to the jury
 
 
 [4]
 An alternative basis for finding this statute not applicable to the particular indemnity claim here, even if generally applicable to such indemnity agreements, might be that B & O's liability here does not "result" or "arise from" its "sole negligence," the only indemnification proscribed by the statute. Though there has been no direct adjudication that the fault of the unknown vandals concurred with the B & O's negligence as legal cause of the injury, so that B & O's liability does not for that reason result from its "sole neligence," such concurring fault has been virtually assumed in all parties' litigation positions, and is essentially manifest as a matter of law from the undisputed facts of the case
 Although the affected parties have also apparently conceded that the statute does not proscribe indemnification for such "concurring" as opposed to "sole" negligence, we prefer not to rest decision on that basis here. Even if the affected parties have conceded the point, it has not been authoritatively decided by the Maryland courts, and there is enough question about it to make us wary of deciding it in the first instance. In the recent case of Bethlehem Steel Corp. v. G.C. Zarnas and Co., 304 Md. 183, 498 A.2d 605 (App.1985), the highest state court did assume, without deciding, that the statute does not proscribe indemnification for liability resulting from "concurrent" as opposed to "sole" fault.
 This assumption, however, was on the basis of party concession, and the concession ran only to the situation of that case where indemnitor and indemnitee were joint tortfeasors. Here, of course, the indemnification is not sought from a joint tortfeasor. Arguably, the statute's "sole negligence" limitation could be construed as merely an inartful way of preserving the traditional legal right to joint tortfeasor indemnification, leaving the bar intact as to all others, without regard to the possibility of merely shared fault by the indemnitee, ("sole negligence" only means "sole" in relation to the indemnitor). Bearing this out, it would seem somewhat odd that the legislature could have intended that whether a contractor could pass on to complete outsiders the risks of his negligence, thereby avoiding responsibility for safe performance, should turn on whether the contractor's negligence was or was not joint with one other than the indemnitor. Because this open question of state statutory construction is both important and unclear, we prefer to avoid it as a basis for decision.
 
 
 [5]
 We need not and do not decide that the statute is aimed only at the direct parties to construction contracts as would-be indemnitees. The point is merely that these are the statute's most obvious objects and that the intended reach of the statute can therefore best be gauged by assessing the extent to which risk-shifting efforts by others raise the same concerns that obviously attend such efforts by parties to construction contracts
 
 
 [6]
 The district court also concluded, in an oral ruling from the bench, that the statute did not apply to this indemnity agreement. The full basis for the ruling is not clear from the court's analysis. It may have included, by implication at least, the basis on which we also find non-applicability
 In affirming the district court's general conclusion that the statute does not apply to this agreement, we do not, however, accept the court's apparent view that this results in part at least from the fact that the sewer line under construction here was not a "building, structure, appurtenance or appliance."