991 F.2d 790
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
James C. RAYNER, Sr., Plaintiff-Appellee,
v.
CSX TRANSPORTATION, Incorporated, Defendant-Appellant.
 No. 92-1143.
 United States Court of Appeals,
Fourth Circuit.
 Argued: October 30, 1992
Decided: April 8, 1993
 
 1
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Edward S. Northrop, Senior District Judge. (CA-90-2535-B)
 
 
 2
 Argued: Stephen Bennett Caplis, Whiteford, Taylor & Preston, Baltimore, Maryland, for Appellant. Lawrence Alan Katz, Coffey & Kaye, Bala Cynwyd, Pennsylvania, for Appellee.
 
 
 3
 On Brief: H.Russell Smouse, Nancy S. Allen, Whiteford, Taylor & Preston, Baltimore, Maryland, for Appellant. Joseph A. Coffey, Jr., Robert E. Myers, Coffey & Kaye, Bala Cynwyd, Pennsylvania, for Appellee.
 
 
 4
 D.Md.
 
 
 5
 AFFIRMED.
 
 
 6
 Before MURNAGHAN and HAMILTON, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 
 KAUFMAN, Senior District Judge:
 
 7
 James C. Rayner, Sr., an engineer employed by CSX Transportation, Inc. (CSX), was injured when he slipped and fell on an ice covered pathway in CSX's railroad yard in Willard, Ohio ("the Yard"). Rayner sued CSX in the United States District Court for the Eastern District of Pennsylvania, pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60 (1988). The case was transferred to the United States District Court for the District of Maryland in which a jury trial was held. Judgment was entered for Rayner in the amount of $390,000.
 
 
 8
 CSX appeals the District Court's denial of its two motions for a directed verdict, contending that Rayner failed to show either that CSX was negligent or that its failure to remedy the slippery conditions was the proximate cause of Rayner's fall. We affirm.
 
 
 9
 * The evidence at trial showed that, on December 30, 1988, Rayner entered the Yard, dropped his freight cars off, and brought his engines to the fuel track for refueling. Thereafter, Rayner and his brakeman walked down a pathway in the direction of the main office. The pathway at issue was a heavily traveled walkway from the track area to the Rx, a building containing the office of the on-site manager. The train crews used the office to communicate with railroad supervisors in Florida. A concrete, paved pathway ran from the Rx to the YMCA, a dormitory used to house train crews between assignments. On December 30, 1988, that pathway to the YMCA was plowed and salted; however, the pathway from the track area to the Rx was not cleared, salted or sanded in any manner and was covered with ice, snow, fuel, and grease. Although Rayner was wearing boots issued by CSX, he fell twice on that pathway. Rayner and his brakeman eventually reached the Rx by walking between the rails of the track. Rayner filed an accident report and then proceeded to the hospital. Rayner's injuries included two herniated cervical discs, lumbar spine nerve damage, and lumbar radiculopathy affecting the right leg. Those injuries permanently disabled Rayner from employment as a locomotive engineer.
 
 
 10
 Cecil Simmons, another CSX engineer, testified that the day before Rayner's accident, he had slipped twice on the icy pathway from the track area to the Rx and had warned his supervisor, Mark Ragland, about the dangerous conditions. According to Simmons, Ragland merely joked about the situation.
 
 
 11
 Patrick Bevier, the Safety Chairman at the Yard, inspected the area after the accident. He testified that he had previously recommended that a particular ditch be filled to prevent the accumulation of water which could freeze, and that a concrete walkway should be built between the Rx and the area where the crews dismounted. No such actions were taken by CSX.
 
 
 12
 Samuel T. Kirk, a railroading expert, testified that ice should be removed from an area where engineers have to walk.
 
 
 13
 At the close of Rayner's evidence, CSX moved for a directed verdict. After the trial judge denied that motion, CSX presented to the jury evidence which, it contends, established that the remedial measures suggested by Rayner would not have improved the Yard's condition. Ragland testified that neither salt nor sand would have had any effect because of the pathway's ballast surface. CSX also produced a Manual authored by the Maryland Department of Transportation entitled "Winter Operations-Snow/Ice" which states that application of salt is relatively ineffective at temperatures below twenty degrees fahrenheit. However, that document also stated that salt can melt ice at temperatures as low as negative six degrees fahrenheit. Evidence introduced by CSX established that the temperature on the day of the accident ranged from a low of eight degrees to a high of thirty-three degrees fahrenheit.
 
 
 14
 At the close of all of the evidence, CSX again submitted a motion for a directed verdict, which the trial judge denied. The jury returned a verdict in favor of Rayner in the amount of $390,000 plus interest and costs. CSX timely noted this appeal.
 
 II
 
 15
 CSX contends that the district court erred in denying its motions for a directed verdict because Rayner failed to produce sufficient evidence to support the elements of a FELA claim. CSX maintains that, since Rayner did not have an expert witness testify about conditions at the Yard, he failed to adduce the minimum amount of evidence necessary to prove CSX negligent. Furthermore, CSX asserts that Rayner's failure to introduce expert evidence concerning the efficacy of the curative measures which he claims CSX should have taken precludes a finding that CSX's failure to take such curative measures was a proximate cause of Rayner's fall.
 
 
 16
 Rayner responds that the district court's denial of CSX's motions for a directed verdict was proper because there was evidence to enable a jury to conclude that the railroad had notice of a dangerous condition and yet failed to take reasonable steps to make the pathway safe. Further, Rayner argues that the jury did not need the assistance of an expert in order to find CSX liable in the within case because the danger presented by the conditions at the Yard and the efficacy of the proposed remedial measures were within the ken of ordinary citizens.
 
 III
 
 17
 A directed verdict is properly granted only when there is no substantial evidence to permit a reasonable jury to find in favor of the nonmoving party. Gairola v. Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985). In deciding such a motion the trial court's "sole duty is to examine the sufficiency of the evidence tendered by the party opposing the motion. If the evidence is sufficient, the judge should not direct the verdict." Ellis v. International Playtex, Inc., 745 F.2d 292, 298 (4th Cir. 1984). The evidence should be viewed in the light most favorable to the non-moving party. Townley v. Norfolk & W. Ry., 887 F.2d 498, 499 (4th Cir. 1989). In cases under FELA, "Congress vested the power of decision in these[FELA] actions exclusively in the jury in all but the infrequent cases where fairminded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." Rogers v. Missouri Pacific R.R. Co., 352 U.S. 500, 510 (1957) (footnote omitted).
 
 
 18
 FELA is the exclusive remedy for interstate railroad employees injured during the course of their employment. Since Congress enacted FELA with a humanitarian purpose, it should be liberally construed in favor of the injured worker. See Urie v. Thompson, 337 U.S. 163, 180 (1949). FELA allows recovery for damages if the employer's "negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Rogers, 352 U.S. at 506; Brown v. Baltimore & O. R.R., 805 F.2d 1133, 1137 (4th Cir. 1986). The standard of proof in a FELA claim is "most lenient." Brown, 805 F.2d 1137. However, even so, Rayner must have established some act of negligence by CSX in order to prevail. Hurley v. Patapasco & B. R.R., 888 F.2d 327, 329 (4th Cir. 1989). At issue in this case are CSX's contentions that Rayner failed to prove that CSX breached any duty owed to Rayner and that CSX's inaction was a proximate cause of Rayner's injuries.
 
 IV
 
 19
 Under FELA, a plaintiff has met his burden with regard to the duty element if he proves that the defendant knew or should have known of "conditions which created a likelihood that petitioner in performing the duties required of him would suffer just such an injury as he did." Rogers, 352 U.S. at 503 (footnote omitted). Demonstrating that the injury was reasonably foreseeable is "one of the essential ingredients" establishing negligence under FELA. Gallick v. Baltimore & O. R.R., 372 U.S. 108, 117 (1963); Brown, 805 F.2d at 1137.
 
 
 20
 In the case at bar, there was sufficient evidence from which the jury could have found that Rayner's accident was foreseeable. CSX employed an on-site manager who had been apprised of the dangerous conditions one day before Rayner's accident. In addition, there was testimony that the Safety Chairman had recommended that measures be taken to remedy precisely the icy conditions which precipitated Rayner's fall.
 
 
 21
 CSX contends that Rayner's failure to adduce expert testimony concerning the feasibility of elimination or significant reduction of the icy conditions dooms his claim. This Court has never required that such expert testimony be presented in a FELA case of the within type. That is not to say that expert testimony may not be needed in some FELA cases. Indeed, where the alleged negligence involves highly technical machinery or conditions, expert testimony may well be required. See Hurley v. Patapsco & B.R.R.R., 888 F.2d 327, 329-30 (4th Cir. 1989) (expert needed to show proper conditions of operating specialized lathe). But when, as in the case at bar, the alleged negligence involves matters within the scope of the common knowledge of members of the community, such testimony is not required. Such a sliding scale type of approach mirrors the general negligence principle that expert testimony is not needed "where the negligence and harmful results are sufficiently obvious as to lie within common knowledge." Fitzgerald v. Manning, 679 F.2d 341, 350 (4th Cir. 1982) (quoting 61 Am. Jur. 2d 350, p. 513).
 
 
 22
 In the case at bar, the jury heard Simmons testify that he had twice slipped the day before Rayner's accident and that he had informed Ragland of the dangerous conditions on that same day. Also before the jury was the testimony of Bevier, the Safety Chairman of the Yard, that he had recommended that CSX construct a concrete walkway in place of the path on which Rayner fell and that various other precautions be taken to prevent the accumulation of ice, and that CSX had not acted upon those recommendations. The Maryland Department of Transportation Manual stated that salt would cause ice to melt to some extent at temperatures as low as negative six degrees fahrenheit and the evidence introduced by CSX showed that the temperature during the relevant time period was never less than eight degrees fahrenheit. The jury also heard Kirk, a former Superintendant of Operating Practices with CSX, testify that salt and/or sand should have been applied to the icy areas.
 
 
 23
 Given such evidence, Rayner did not need expert testimony. That ice can cause people to slip and that there are certain actions, such as sanding and salting, frequently taken to cure the danger of such slips, are matters of common knowledge. Moreover, Rayner did not solely rely on the general proposition that ice can cause slips, but also introduced testimony that one of his coworkers had slipped near the site of Rayner's accident on the day preceding that accident. In other words, there was ample evidence from which the jury could reasonably have inferred negligence on the part of CSX.
 
 V
 
 24
 In order to establish the negligence of CSX as a proximate cause of his injury, Rayner was required to demonstrate a link between the unsafe work environment and his accident. See Hurley, 888 F.2d at 330. Rayner needed only to prove that CSX's negligent failure to alleviate the dangerous conditions on the icy pathway"played any part, even the slightest" in producing his injury. Rogers, 352 U.S. at 506.
 
 
 25
 There was more than sufficient evidence for the jury to find an evidentiary link between the conditions at the Yard and Rayner's injuries. Had CSX taken any of a number of commonly employed precautionary measures (e.g. salt, sand, chopping and physically clearing the ice from the path), the jury could have concluded that the danger presented by the icy pathway would have been considerably less. This was a matter within the ken of Maryland jurors to whom snow and ice and the measures commonly taken to deal with them safely are not total strangers. Permitting the jury to draw upon its common knowledge to infer causation under the circumstances of the instant case is eminently reasonable.
 
 
 26
 Nor does Hurley v. Patapsco & B.R.R.R., 888 F.2d 327 (4th Cir. 1989), heavily relied upon by CSX, in which we upheld the district court's grant of a motion for directed verdict, compel a different conclusion. In Hurley, the plaintiff "had exclusive responsibility for the safe operation of the Reed-Prentice lathe," id. at 329, well prior to his accident. The evidence in that case suggested that Hurley had suffered serious injuries when his sweater was caught by the lathe and he was pulled into the machine. Hurley contended that the railroad was negligent in not providing adequate lighting. The only evidence offered in support of that contention was the plaintiff's own testimony and three photographs from which "the district court found that the jury could not discern the amount of light in the repair shop generally or at the Reed-Prentice lathe." Id. at 329. Hurley presented no evidence tending to show what level of additional lighting would have been necessary to ensure safe operation of a Reed-Prentice lathe or "why the lighting in the repair shop made operation of the lathe dangerous or how direct lighting could have prevented this accident." Id. at 330.
 
 
 27
 Dealing with icy conditions so as to improve safety is a matter of which the average member of a Maryland jury can reasonably be expected to be knowledgeable. The same cannot be said with regard to the proper conditions for safe operation of a sophisticated piece of industrial machinery.
 
 
 28
 Accordingly, the decision of the court below is affirmed.
 
 AFFIRMED