ALTENBERND, Judge.
The Department of Transportation (DOT) appeals a judgment that awarded $502,462.22 as indemnity to CSX Transportation. The judgment indemnified CSX for the amount of a settlement and related attorneys’ fees paid by CSX to resolve a negligence action arising from an accident at a railroad crossing. DOT maintains that the indemnity clause, which was the *211 sole consideration for a crossing agreement between DOT and CSX, is invalid because DOT’S predecessor had no legal authority to enter into the agreement. In the alternative, DOT argues that the collectible portion of any judgment entered for breach of the crossing agreement must be limited to $200,000, the amount authorized by section 768.28(5), Florida Statutes (2002). It maintains that CSX must seek any additional payment of the judgment from the Florida Legislature. We conclude that the agreement is enforceable and affirm the judgment in its entirety. At the end of this opinion, we certify these issues to the supreme court as questions of great public importance.
I. THE EARLY HISTORY OF THIS INDEMNITY AGREEMENT
In 1936, during the midst of the Great Depression, the State of Florida wanted to build a road in Pasco County on the abandoned right-of-way of an old logging railway that had served Fivay, Florida. Fi-vay had been a very prosperous logging community around 1910, but it was little more than a ghost town by the mid-1980s.[1] To build this road, the State Road Department needed to cross an active railroad line operated by the Seaboard Air Line Railway Company.
During the depression, the railroad was in receivership. Accordingly, the State Road Department negotiated a crossing agreement with the receiver. We have attached a replica of that agreement as Appendix A to this opinion. The agreement essentially permitted the State Road Department, as a licensee, to build and maintain a road that crossed the railroad tracks. The State did not buy or lease the land. The sole consideration for this license was an indemnity agreement in paragraph nine of the license by which the State Road Department agreed to protect the railroad from any loss related to the State Road Department’s activities at the crossing.
The State Road Department built this rural road, State Road 210, and the crossing agreement undoubtedly was filed away in the filing cabinets of one or both parties. One imagines that on a daily basis a few cars and a few horse-drawn vehicles crossed the railroad tracks in 1939 when the population of Pasco County was less than 14,000.[2]
II. THE ACCIDENT
On October, 29, 2002, a husband and wife were riding eastbound in their car on State Road 52 near Giddens Road. A truck, heading westbound, went over some railroad tracks owned by CSX. The crossing was allegedly in poor maintenance, and a trailer behind the truck disconnected. The trailer and its load of lumber struck the couple’s car, killing the husband and badly injuring the wife. State Road 52 is the successor number for State Road 210. The railroad crossing is the subject of the 1936 crossing agreement; CSX is the successor in interest to the Seaboard Air Line Railway Company, and DOT is the successor to the State Road Department. By 2002, this road was a major highway, connecting 1-75 on the east to the newly constructed Suncoast Parkway on the west.
The wife, on her own behalf and as personal representative of the estate of *212 her husband, filed suit against CSX in 2004. The truck driver who dropped the trailer was apparently never identified and was not a party to the lawsuit. CSX brought DOT into this action as a third-party defendant in 2008. Ultimately, following a settlement with the plaintiffs, the trial court entered this judgment requiring DOT to indemnify CSX in the amount of $125,000 for the settlement of this lawsuit and $377,462.22 for the expenses arising from its failure to defend the suit.
III. THE ENFORCEABILITY OF THE CROSSING AGREEMENT
The only issues on appeal concern the enforceability of the crossing agreement. DOT maintains the indemnity clause is void because the State Road Department never had authority to enter into an indemnity agreement. In the alternative, it argues that any judgment under the agreement is subject to the statutory limitation under sovereign immunity. We reject both arguments.
Concerning the argument that the State Road Department had no authority to enter into this agreement, we note that the issue is similar to the issue addressed in American Home Assurance Co. v. National Railroad Passenger Corp., 908 So.2d 459 (Fla.2005). American Home involved a comparable agreement negotiated by a utility authority that was a municipal agency. Id. at 463. The supreme court enforced the agreement, but it emphasized that it was not resolving the issue as to a state subdivision or agency. Id. at 473-74. As for a private property owner, the supreme court enforced such an agreement more than fifty years ago. See Russell v. Martin, 88 So.2d 315 (Fla.1956).
In deciding this issue, we observe that DOT underestimates the ramifications of its position for itself, for Florida’s sixty-seven counties, and perhaps for other state agencies and subdivisions. DOT regards the indemnity agreement as an incidental provision in this contract, assuming that its enforceability can be severed from the overall licensing agreement. But the indemnity agreement is the sole consideration that the State has provided to CSX for this long-standing license to use its property. If we were to rule in favor of DOT and hold that the indemnity agreement has always been void, then there would never have been any consideration provided by DOT for this crossing agreement. The agreement arguably would be an “illusory contract.” See Pan-Am Tobacco Coi’p. v. Dep’t ofCorr., 471 So.2d 4, 5 (Fla.1984). While one would hope that CSX would take no drastic steps in response to such a holding, CSX arguably would have the right to treat the entire agreement as void. Even if our ruling did not render the entire agreement void, CSX would have the right to terminate the agreement in ninety days under paragraph 10 of the agreement. At that point, CSX might be entitled to prevent any vehicles from crossing its tracks, effectively closing State Road 52.
The agreement in question is obviously a standardized agreement. Our record does not establish how many comparable agreements may be filed in dusty file cabinets of counties and other state agencies and subdivisions, but DOT admitted at oral argument that it is aware of other similar agreements. Certainly, there are hundreds of such crossings involving county roads in Florida. We know from legal research that similar indemnity agreements were common both for crossing agreements and sidetrack agreements.[3] *213 When Florida was a sparsely populated state, such agreements were a low-cost arrangement to permit economic development near railroad tracks. The railroad undoubtedly hoped that the development would eventually foster greater use of its services by persons not in privity under the crossing or sidetrack agreements. If we were to hold that such agreements with the state were void from inception, the immediate impact on Florida is impossible to calculate from this record, but it could be far greater than the judgment on appeal. Thus, we do not deny that there are practical reasons for this court to enforce this long-standing agreement.
DOT characterizes this issue as a challenge to the State Road Department’s authority to enter into an indemnity contract in 1936. We conclude that the issue is somewhat more complex. This is not a case in which a contractor was building a road and, over and above a monetary payment for the construction project, the state agreed to indemnify the road builder for certain risks. Nor is this an indemnity agreement that is incidental to a primary contract under which the state was receiving grant funds. Cf. Op. Att’y Gen. Fla. 78-20 (1978). The indemnity agreement applies to losses arising only in connection with the DOT’S obligations to perform under this agreement; DOT is not indemnifying CSX for negligent acts of CSX or others.
DOT is actually challenging a contract by which it obtained right-of-way. The State Road Department wanted to enter into the contracts necessary to build a road. There is no question that the State Road Department had the authority to build a road. It also had the authority to obtain the right-of-way to build the road. Thus, DOT must agree that the State Road Department could have purchased the land or paid an annual fee for its use. In all probability it could have taken the land by eminent domain. Rather than bind the state to a lump sum payment at the inception of this contract or to annual payments throughout the term of this agreement, the State Road Department obtained the right-of-way through a license that apparently was free of charge for its first sixty-five years.
This is also a contract creating continuing obligations. The parties in 1936 did not enter into a contract that was fully executed in a year or two. DOT has had an obligation to maintain, repair, and reconstruct its road on this property at all times, and CSX has had an obligation to give DOT access to the property for those purposes.[4] Never, until CSX asked DOT to pay the consideration for this ongoing agreement, did DOT claim it was not bound by this contract or that the railroad was not entitled to the benefits of this agreement.
*214 The nature of the risk involved in this contract is also noteworthy. When a railroad crossing is dangerously rough, it is either the result of a failure to maintain the tracks or a failure to maintain the road, or a combination of both. The railroad has no claim to any immunity or to any cap upon its liability. It cannot bind members of the public to its agreement with DOT as to which entity will maintain the property that is owned by the railroad and licensed to the state. It knows, as this case demonstrates, that it will be the defendant of first choice when the other option is a governmental entity. In the absence of an indemnity clause as the consideration for this crossing agreement, the railroad would have little choice but to charge a state agency an annual fee sufficient to insure the risk fully.
Thus, the issue in this case is whether DOT, as the successor to the State Road Department, is bound by the written agreement under which the railroad has fully performed for sixty-five years and has provided DOT with a right-of-way in exchange only for an agreement that DOT indemnify the railroad for all loss “arising or growing out of the construction, condition, maintenance, alteration or removal of the highway.”[5] Despite the reservations concerning indemnification agreements discussed in American Home, we conclude that the crossing agreement is enforceable in this context and that DOT is bound by this agreement. DOT and its predecessor had the authority to enter into contracts necessary to build and maintain this road, and the use of a limited indemnity agreement as the sole consideration for the contract to obtain right-of-way did not render it unenforceable when a condition requiring indemnity finally occurred.
We recognize that Florida’s Constitution states that “[n]o money shall be drawn from the treasury except in pursuance of appropriation made by law.” Art. VII, § 1(c), Fla. Const. We do not read this provision to prevent the trial court from having the power to enter a monetary judgment requiring DOT to indemnify CSX for the settlement and defense of the underlying negligence action. A court may not issue an execution to permit state property to be seized to pay such a judgment. At most, by writ of mandamus, a court might require an agency to take the steps necessary to pay the judgment in an orderly fashion. See Florida Dep’t of Env’t Prot. v. ContractPoint Fla. Parks, LLC, 986 So.2d 1260, 1271-72 (Fla.2008).
Concerning the argument that this judgment must be limited to the state’s liability under section 768.28(5), we conclude that DOT’s liability in 2002 to CSX was based on an express written contract. See Pan-Am Tobacco Corp., 471 So.2d at 5-6. The statutes limiting liability in cases of the legislature’s partial waiver of sovereign immunity apply only to judgments recovering damages for tort, not to judgments recovering damages under legal theories that may be analogous to torts. See Provident Mgmt. Corp. v. City of Treasure Island, 796 So.2d 481, 486-87 (Fla.2001).[6]
*215 Because we recognize that this decision could apply to other similar long-standing crossing and sidetrack agreements throughout Florida between railroads and counties or other state agencies and subdivisions and because questions concerning the enforceability of these agreements could affect commerce, we certify the following questions to the supreme court as questions of great public importance:
IS DOT BOUND BY A RAILROAD CROSSING AGREEMENT UNDER WHICH IT RECEIVED A REVOCABLE LICENSE TO USE LAND AS RIGHT-OF-WAY IF THE SOLE CONSIDERATION FOR THE LICENSE WAS AN AGREEMENT TO INDEMNIFY THE RAILROAD FOR LOSSES ARISING OUT OF DOT’S ACTIVITY ON THE LAND? IF SO, IS DOT’S LIABILITY UNDER THE CROSSING AGREEMENT LIMITED BY SECTION 768.28(5), FLORIDA STATUTES (2002)?
Affirmed.
CRENSHAW, J., Concurs.
WALLACE, J., Dissents with opinion.
APPENDIX A

[The actual agreement was produced on a typewriter. The copies in the record are not high quality. This is a replica.]

The Crossing Agreement
GS 82166
ssh
3-23-36
THIS AGREEMENT, made this 29th day of May, 1936, between L.R. Powell, Jr., and Henry W. Anderson, as Receivers of Seaboard Air Line Railway Company, hereinafter designated “Receivers”; and State Road Department of Florida, a body corporate under the laws of the State of Florida, hereinafter designated “Licensee”;
WITNESSETH THAT WHEREAS, the Licensee desires to construct that certain road crossing over the tracks and property of the Receivers at a point 1305 feet, more or less, northwardly from Mile Post 817, as measured front Richmond, Virginia, said crossing being located in or near Fivay, Pasco County, Florida, as shown in RED on blue print 34707, attached hereto as a part hereof;
NOW, THEREFORE, for and in consideration of the premises and mutual advantages accruing to the parties hereto, it is covenanted and agreed by and between them as follows:
1. The Receivers hereby grant unto the Licensees the right and privilege, terminable, and with the limitations, as hereinafter expressed, to locate and continue over and upon said right of way and property, at grade, the said highway.
2. The Licensee will construct and maintain the said highway upon said right of way and property, at such times and in such manner as not to impede, interfere with, hinder or delay the passage of trains, engines and cars of the Receivers.
3. The Licensee shall bear any and all expense of every character incident to the construction, reconstruction, repair, alteration or maintenance of said highway upon said right of way and property, no assessment, levy or expenditure to be made against or required of the Receivers on account of any of the aforesaid matters, or on account of paving, drainage, fences or other improvements in connection therewith; nor shall the Receivers be required to bear the cost of any watchman or gates installed on account of the said highway crossing.
*216 4. The right and privilege herein granted so to locate and construct said highway over and upon said right of way and property is limited to the use of said right of way and property for public highway purposes only, and should said right of way and property, or any part thereof, so occupied by said highway, at any time cease to be used for public highway purposes, or in the event the Licensee shall default in any of its undertakings herein contained, then the Receivers may at any time thereafter, at their option, cancel this agreement by written notification to the Licensee, and in the event of such cancellation all the rights and privileges in and by this agreement to the Licensee granted, and all the estate, right, title and interest of the Licensee, the State of Florida, or the public, in and to the aforesaid right of way and property, shall thereupon cease, determine and revert to the Receivers. It is further understood and agreed that should said right of way and property, or any part thereof, at any time hereafter be needed by the Receivers for railroad purposes, then, upon the expiration of ninety days notice in writing from the Receivers to the Licensee, the said road or highway shall be moved or narrowed by the Licensee to such extent as, in the opinion of the Receivers, may be necessary for the purpose aforesaid. And in any of such events, or in the event of termination of this agreement in any other manner, the Licensee hereby agrees to restore, at its sole cost, said right of way and property so occupied by said highway to approximately the condition thereof prior to the location thereon of said highway.
5. Should the said highway as so located upon said right of way and property at any time, in the opinion of the Chief Engineer or other proper officer of the Receivers, interfere with or retard the drainage of said right of way and property, the Licensee shall upon notice so to do from the Receivers, at its (the Licensee’s) sole cost, remedy such condition of said drainage in manner satisfactory to said Chief Engineer or other proper officer.
6. The Licensee hereby agrees that any industrial tracks, turnouts, or other tracks, which the Receivers shall construct, may, if the Receivers so desire, be constructed across the said highway, the cost of any highway repair or restoration work made necessary as a result of any such track crossing to be borne by the Licensee. It is expressly stipulated that the Receivers will not be required to bear the cost of any watchmen, gates, or any drainage facilities of any character whatever installed on account of any such track crossings which have been or may hereafter he made.
7. It is expressly stipulated that the Licensee shall have no right hereunder to construct, maintain and/or operate, nor to permit or authorize others to construct, maintain and/or operate any electric, telephone or other wires or poles, or any gas, water, sewer or other pipes, mains or conduits, or any street car tracks or other facilities of any kind, upon, over or beneath said highway as permitted to be constructed hereunder.
8. Should any sign posts, or signs or fencing, in the opinion of the Receivers, be necessary at or in the vicinity of the said highway or be required by the Licensee, or other public authority, for the purpose of safeguarding traffic, the Licensee shall, upon being notified so to do by the Receivers, provide and install the said sign posts or signs or fencing.
9. The Licensee will indemnify and save harmless Receivers from and against all loss, damage or expense arising or growing out of the construction, condition, *217 maintenance, alteration or removal of the highway hereinabove described.
10. It is expressly agreed that in the event the Licensee shall, without the written consent of the Receivers first obtained, make any change or alteration in the location of said above described road or highway, and/or construct or extend any other highway upon, over or across the right of way or other property, and/or within one hundred feet of the center line of any railroad track, of the Receivers, then in all or any of such cases the Receivers shall have the right, if they so elect, to terminate this agreement and all the estate, right, title and interest of the Licensee and of the public hereunder upon ninety days prior written notice of the intention so to do. And upon such termination by the Receivers all of said estate, right, title and interest shall cease, determine and revert to the Receivers.
11. It is understood and agreed that the rights and privileges herein set out are granted only to the extent of the Receivers’ right, title and interest in the land to be entered upon and used by the Licensee.
12. The provisions of this contract shall be binding upon and shall inure to the benefit of the Receivers of Seaboard Air Line Railway company (as Receivers, but not individually) [a]nd their successors. Regardless of anything in this contract contained, the continuance of this contract after the said Receivers or their successors cease to control and operate the line of railroad on or along which the property covered by this contract is located shall depend upon such orders as may be entered by the District Court of the United States for the Eastern District of Virginia.
13.Nothing herein or hereby, nor any act of said Receivers nor of the Licensee shall operate as an adoption or affirmance by the said Receivers of the lease between Tampa Northern Railroad Company and Seaboard Air Line Railway Company dated January 5, 1926, and/or agreement as supplemental thereto dated October 1, 1928, or as a waiver of their right to reject or disaffirm said lease and/or agreement supplemental thereto, the Licensee hereby agreeing that the said Receivers reserve in all respects their right hereafter to adopt or to disaffirm and reject said lease and/or agreement supplemental thereto.
IN TESTIMONY WHEREOF, the parties have caused these presents to be duly signed and sealed, the day and year first above written.
[the signatures have not been replicated]

. See History of Fivay, Pasco County, Florida (Sept. 21, 2012) http://www.fivay.org/fivay. html.

. See Richard L. Forstall, Florida Population of Counties by Decennial Census: 1900 to 1990, U.S. Census Bureau, (Mar. 27, 1995) http://www.census.gov/population/cencounts/ fll90090.txt.

. See, e.g., Sol Walker & Co. v. Seaboard Coast Line R.R., 362 So.2d 45, 47-48 (Fla. 2d DCA 1978); Brown v. Balt. & Ohio R.R. Co., 805 F.2d 1133, 1135-36 (4th Cir.1986); Chi. & *213 Nw. Transp. Co. v. Negus-Sweenie, Inc., 549 F.2d 47, 48 (8th Cir.1977); Harleysville Mut. Ins. Co. v. Reliance Nat’l Ins. Co., 256 F.Supp.2d 413, 415-16 (M.D.N.C.2002); S. Pac. Co. v. Gila River Ranch, Inc., 105 Ariz. 107, 460 P.2d 1 (1969); Langemo v. Mont. Rail Link, Inc., 307 Mont. 293, 38 P.3d 782, 784, 787 (2001); Erie R.R. v. Buffalo & Lacka-wanna Traction Co., 220 A.D. 520, 221 N.Y.S. 680, 681 (N.Y.App.Div.1927); Sommerville v. Pa. R.R., 151 W.Va. 709, 155 S.E.2d 865, 868 (1967).

. Section 335.141(2)(c), Florida Statutes (2002), discusses maintenance of such crossings. It places the duty to maintain on the railroad, "unless the maintenance has been provided for in another manner by contractual agreement entered into prior to October 1, 1982.” Thus, the statute in effect at the time that DOT had a duty to maintain this crossing to prevent this accident seems to have expressly recognized that a contract like the 1936 contract would control.

. The dissent is correct that this explanation relies on a concept of estoppel. We simply conclude that the case law permits the application of estoppel in this limited context.

. As a practical matter, the portion of this judgment that equates to the plaintiff's claim in the initial lawsuit is within the statutory limitation provided by section 768.28(5). It is the reimbursement of attorneys’ fees and costs for failure to defend this action that is the major portion of this judgment.