BENNETT, APPELLANT, *v.* HEIDINGER, APPELLEE.

(No. 50335 — Decided March 31, 1986.)

*George Wm. Joseph, Jr.,* for appellant.

*Leo R. Ward,* for appellee.

ANN MCMANAMON, J. James E. Bennett, the plaintiff below, timely appeals from a decision of the Parma Municipal Court which denied Bennett's entitlement to polygraph test charts (polygrams) prepared by defendant Robert F. Heidinger at Bennett's request.

Bennett's sole assignment of error posits that the court's finding is against the manifest weight of the evidence.

On October 22, 1984, Bennett and Heidinger orally agreed that the latter would conduct a polygraph examination of Bennett's wife, Elby A. Bennett, to test her marital fidelity. Mrs. Bennett consented to the examination, which was held on October 24, 1984. She also signed a release which authorized Heidinger to disclose the examination results and his opinions to her husband.

Defendant supplied the plaintiff with a verbal opinion of the test results six days after the examinations and followed up with a written report containing his opinions as to those results. It was Heidinger's opinion that Elby Bennett had truthfully denied having extramarital affairs.

Heidinger later received a letter from Bennett requesting another review of the test results. Bennett specifically asked the defendant for a list of the questions posed and how they were answered; whether the responses were truthful; the type of test and machine used. No specific request was made for the polygrams. This letter was followed by another dated November 9, 1984, advising Heidinger that Bennett had retained counsel and now wanted the test charts for review.

This letter was followed, two weeks later, with a visit by plaintiff and his attorney to defendant's office with a request to see the polygrams. Heidinger permitted the pair to review the charts, and again explained the procedures used, the results, and his opinions. The defendant further informed Bennett that he would permit any qualified examiner of Bennett's choice to meet with Heidinger and view and discuss the charts. However, the defendant refused plaintiff's request for a copy of the charts.

Bennett subsequently instituted the instant contract action, seeking an order for release of the polygrams as well as compensatory and punitive damages for expenses incurred in his efforts to obtain them. The defendant answered and asserted a counterclaim and a cross-claim for declaratory judgment, requesting a ruling that the service contract between the parties did not require him to provide the polygrams to the plaintiff.

The matter was tried to the court, which found that the parties did not bargain for plaintiff's receipt of the charts, and rendered judgment for the defendant accordingly.

Bennett argues that the trial court erred in failing to conclude from the evidence that the defendant was under a contractual duty to supply him with the polygrams.

A reviewing court will not reverse a verdict as being against the manifest weight of the evidence where there is some competent, credible evidence going to all the essential elements of the case. C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578. Whether the subject contract obligated Heidinger to provide the charts to Bennett turns on the intent and purpose of the parties in formulating their agreement. The relevant inquiry is the manifestation of intent of the parties as seen through the eyes of a reasonable observer, rather than the subjective intention of the parties. See 1 Corbin on Contracts (1963), Section 9; Restatement of the Law 2d, Contracts (1981), Sections 1 and 3. A contract must be construed with reference to its subject matter, nature, and object or purpose. McBride v. Prudential Ins. Co. of America (1947), 147 Ohio St. 461, 34 O.O. 381, 72 N.E. 2d 98.

In formulating their oral agreement, the parties neither defined the term "results" nor specifically discussed the subject of charts. However, Heidinger's testimony concerning the formation of the contract could lead a reasonable person in his position to believe that the parties never intended to contract for the charts:

"Q. Would you please tell the Court exactly what you agreed to do for $250?

"A. I agreed to give his wife a polygraph examination and give him my opinion as to the results of the test, whether she was truthful or not, like I do for all my clients.

"Q. That $250 include[s] giving James Bennett a copy or an original of your polygram charts?

"A. No way.

"Q. Have you ever contracted with anyone to do that?

"A. No, sir.

"Q. Have you ever released any of your charts?

"A. No, sir.

"Q. Did James Bennett ask you about those charts?

"A. No, sir.

"Q. Prior to the conducting of the exam?

"A. No, sir.

"Q. Prior to the paying of the $250?

"A. No, sir."

The record demonstrates that the plaintiff again made no mention of, nor request for, the charts on the day the examination was administered, or during the parties' numerous communications, including Bennett's November 23 visit to the defendant's office with his lawyer and his letter sent in early November.

The record further reflects that Heidinger's reluctance to release polygrams stems from his view that a proper chart analysis cannot be made absent reference to other crucial information. In response to counsel's question why he desired to be present, were the charts to be reviewed by another qualified polygraphist, Heidinger told the court:

"A. Because no one can interpret someone else's charts without knowing the facts. Each chart is marked individually with certain notations and unless someone knows my notations or shorthand, they wouldn't, probably wouldn't know what I was writing or why these quotations were made.

"Q. You mean they're not standard?

"A. Not completely. Such things as sneezes, finger movement, coughs, all of those have to be recorded.

"Q. What's a sneeze got to do with it?

"A. A sneeze will greatly distort the test at that point. In addition —

"Q. Wait a minute.

"A. All right.

"Q. Are there other factors which might go into the interpretation of a chart?

"A. Certainly.

"Q. Such as?

"A. Temperature, humidity, question formulation, somatics, the physiological condition of the person being tested, the psychological condition, the method or type of test being conducted. You heard testimony that there is [sic] at least seven different methods in polygraph testing. A person would have to be familiar with that. They would have to be familiar with the chart markings, such as when the question started, when it stopped. If there were outside noises or activity or distractions, if the room was properly arranged for polygraph testing. Such things as pictures and things can interfere with the test. There is a great deal of things that anyone would have to know before looking at charts and even beginning to guess or render at an opinion."

Bennett essentially testified that he contracted for Heidinger's "results and opinions," and that "a chart is a result." He further stated that he thought he was bargaining for the charts at the time he entered into the contract, and that he expected to get them. It is a well-established proposition of contract law that where reasonable minds might differ as to whether a party assumed a contractual duty to supply certain information to another party, the issue is to be determined by the trier of fact. *Peterson Publishing Co.* v. *Racing Stripe, Inc.* (Apr. 16, 1981), Cuyahoga App. No. 42776, unreported, at 5. We are persuaded that there was sufficient evidence to support the trial court's finding that the parties did not intend their contract to include Heidinger's release of the polygrams to Bennett.

Bennett claims entitlement to the polygrams based not upon his oral contract with Heidinger but, rather, upon the release signed by Elby Bennett authorizing Heidinger to disclose the

test results and opinions to the plaintiff. The release was a separate contract between Heidinger and Elby Bennett and, as a consequence, standing to enforce its provisions is limited to those two parties. See *Visintine & Co.* v. *New York, Chicago & St. Louis Rd. Co.* (1959), 169 Ohio St. 505, 9 O.O. 2d 4, 160 N.E. 2d 311. The form itself expressly permits Heidinger to release information to James Bennett without fear of legal repercussions from Elby Bennett. The content of the information to be released still depended solely upon the oral contract between the plaintiff and the defendant.

Bennett next contends that he has a property right in the test charts in the same way that a patient has a property right in medical and dental records, such as X-rays. See, *e.g., In re Striegel* (S. Ct., Spec. Term 1977), 92 Misc. 2d 113, 399 N.Y. Supp. 2d 584. However, such a property right, as outlined in cases like *Striegel,* belongs to the patient. Since Elby Bennett was the 'subject' of the test, only she can claim entitlement to the charts based on a property right. Further, under *Striegel,* a property right affords a patient "the privilege of reasonable access" to records. *Striegel, supra,* at 116, 399 N.Y. Supp. 2d at 586. In the instant case, Heidinger told Bennett and Bennett's attorney that he would permit any qualified examiner of Bennett's choice to view and discuss the charts. Assuming, *arguendo,* that the plaintiff could assert a property right in the charts, he cannot claim that he was denied reasonable access to them. Finally, while it is reasonable to assume that the release and exchange of X-rays is a widely accepted practice among medical and dental practitioners, it does not necessarily follow that the same assumption may be made with respect to the field of polygraphy.

Bennett further argues that the court's conclusion that the charts should not be made available to him based upon the polygraph industry's custom and usage lacks any evidentiary basis. Extrinsic evidence of custom or usage in a particular industry may be considered in interpreting a contract. See *Alexander* v. *Buckeye Pipe Line Co.* (1978), 53 Ohio St. 2d 241, 7 O.O. 3d 403, 374 N.E. 2d 146.

Heidinger, a twenty-year veteran polygraphist, testified that he has never released or contracted to release test charts. Gerrie Berena, the plaintiff's polygraph expert, similarly testified that she has never released or contracted to release test charts to clients during her eleven years of practice. The testimony of both polygraphists clearly indicates that test charts prepared by one examiner are insufficient in and of themselves to form the basis of a second examiner's opinion. Heidinger and Berena told the court that the charts are but one component part of the raw data which must be considered in toto in order to render an opinion.

Bennett essentially argues that the industry's Code of Ethics, which permits one examiner to testify concerning the charts of another examiner, implicitly authorizes the original examiner to release his charts to others.

Standard and Principle of Practice No. 14 provides:

"A member shall not offer testimony concerning charts or conclusions presented by another member unless he is thoroughly familiar with the test and procedures used by the other member."

We note initially that while this standard permits one examiner to testify concerning another's charts, it is silent as to release of those charts. However, as the defendant correctly argues, this standard is further evidence of the industry's prohibition against expressing opinions based solely upon the test charts.

We find that the record contains ample evidence of manifest weight to support the trial court's finding that

Heidinger was under no contractual duty to supply Bennett with the test charts. In determining that Bennett's assignment of error is without merit, we note that the plaintiff procured the services of several other polygraphists to test his wife's fidelity. We are reminded of the axiom that "Truth, like all other good things, may be loved unwisely — may be pursued too keenly — may cost too much." See *Pearse* v. *Pearse* (1846), 1 De Gex & Sm. 12, 28.

Accordingly, the plaintiff's assignment of error is not well-taken, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

PARRINO, C.J., and MARKUS, J., concur.