NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0666n.06
Filed: September 5, 2006

No. 05-4348

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DUALITE SALES & SERVICE, INC., )
 )
 Plaintiff-Appellant, )
 )
v. ) On Appeal from the United States
 ) District Court for the Southern
MORAN FOODS, INC., d/b/a Save-A-Lot, Ltd., ) District of Ohio
 )
 Defendant-Appellee. )

BEFORE: BOGGS, Chief Judge; COLE, Circuit Judge; and WISEMAN, District
 Judge.[*]

 **BOGGS, Chief Judge.** Dualite appeals the judgment of the district court

granting the motion of Save-A-Lot, Ltd. (SAL) for summary judgment and dismissing claims for

breach of contract. Dualite claims that SAL breached the contracts when it refused to purchase

signs that Dualite had manufactured and held in its inventory. The district court determined that

only fully assembled signs created obligations under the contracts. Because this interpretation of

the contracts was in error, and because genuine issues of material fact exist under our

interpretation, we reverse and remand.

**I**

---

 [*]The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle
District of Tennessee, sitting by designation.

From November 1998 until January 2002, Dualite and SAL entered into a number of purchase agreements (the contracts) that required Dualite to produce large illuminated signs for use outside of SAL's grocery stores. The contracts establish a "Minimum/Maximum Program" on frequently purchased signs. Dualite agreed to manufacture and maintain a number of signs in inventory—more than the minimum and less than the maximum—ready for delivery. The contracts contain the following language:

> All prices are based on a minimum/maximum program, whereby Dualite will automatically increase the inventory levels when the minimum inventory is reached. All orders subject to an overrun or underrun of 10% on the maximum commitment. All prices will be reviewed and adjusted annually, as well as quantities designated under the minimum and maximum categories. In the event of a logo change or if the program is discontinued, Save-a-Lot, Ltd. will only be obligated for any inventories remaining up to the maximum on designated items.

> Take out period is twenty-four months from date of order is entered for signs (not contract date). Any signs remaining in inventory at end of take out period are subject to immediate lot billing. In the event of a logo change, size change, discontinuation of the program, or expiration of the take out time, Save-a-Lot agrees to pay for any signs remaining in stock (up to maximum) immediately. At this time an invoice would be rendered with terms net 30 days. Any signs remaining in our inventory after two years will be subject to storage and insurance charge of two per cent (2%) per month on unshipped balance.

Br. of Appellant at 7; Br. of Appellee at 6 (asterisks in text, referring to minimum and maximum quantities, omitted).

The signs in question have two primary parts, a sign face and a sign housing. Both are custom manufactured. The housing is composed of light-socket boxes, sign backs, extrusions, aluminum, light ballasts, lampholders, bulbs, and electrical wire. Dualite either custom-manufactured or specifically ordered the socket boxes, sign backs, extrusions, and aluminum to

- 2 -

conform to the unique size and type of signs requested by SAL. The sign faces and backs were painted according to SAL's designs. Dualite stored the finished sign components and assembled each sign before shipment. Final assembly required less than one person-day of labor. The completed signs resembled a rectangular box.

In August 2000, SAL redesigned its signs. The new sign had rounded extrusions and a different logo on its face. On November 6, 2000, SAL asked Dualite to cease all production of the old signs and provide "a current inventory of both cans and faces and all Save A Lot signage that is completed and in stock." SAL then placed orders for seventeen new signs, the "second-generation" signs.

At the time of the cancellation in November 2000, Dualite had custom-manufactured parts for 110 SAL signs in its inventory. According to Dualite's president, none of the sign housing inventories can be sold to its other customers because they are unique to SAL's specifications. When the period for taking delivery expired under the first of the contracts, around May 2002, SAL paid for the sign faces in Dualite's inventory but refused to pay for the other components. In September 2003, when it became clear that SAL was not going to pay for the remaining parts of the first generation signs, Dualite refused to deliver seventeen second-generation signs for which SAL was willing to pay.

Dualite filed suit in Ohio state court on December 19, 2003, and SAL filed a notice of removal in the Southern District of Ohio on January 12, 2004. An amended complaint was filed on April 8, 2004, alleging three state-law causes of action, 1) breach of contract, 2) action on

account, and 3) promissory estoppel.  Dualite claimed $179,804 in damages.  On February 16,

2005, SAL moved for summary judgment on all claims.

On August 23, 2005, the district court ruled on SAL's motion for summary judgment.

*Dualite Sales & Serv., Inc. v. Moran Foods, Inc.*, No. 04-13 (S.D. Ohio) [hereinafter First D. Ct.

Op.].  The court noted that the "case presents issues of contract interpretation based on a set of

largely undisputed material facts," and framed the question presented as "whether Save-a-Lot is

obligated to buy only completed signs or whether, under the circumstances of this case,

Save-a-Lot is also obligated to buy the individual component parts that make up the signs."  *Id.* at

2.  The district court then mistakenly interpreted a list of signs within the contracts as a list of

sign components and noted that "there would be no reason to itemize the prices . . . of the

components unless that information was of some significance in the agreement."  *Id.* at 11.  This

factual error was later acknowledged by both parties.  Additionally, the district court noted that

> the agreement was for Dualite to manufacture and Save-a-Lot to purchase signs
> which were custom-made to its specifications.  Except for wire and bulbs, Dualite
> cannot use the components it used to manufacture Save-a-Lot signs to
> manufacture the signs of other customers.  It makes little sense that Dualite would
> obligate itself to keep on hand a minimum supply of speciality parts needed to
> manufacture signs to Save-a-Lot's specifications, but then be stuck with a supply
> of parts in cannot use if Save-a-Lot would decide to make a unilateral decision to
> change its logo.  Thus, it is logical that the purchase agreement was written, and
> should be interpreted, to place the risk and the cost associated with a logo change
> on the purchaser and not on the seller.

*Id.* at 12–13.  For these reasons, the court denied the motion for summary judgment, held that

"signs" and "inventories" in the contractual language had different meanings, and held that SAL

was obligated under the contracts to purchase both.  However, the district court failed to rule on

the viability of Dualite's breach of contract claim for the second-generation signs, which Dualite had refused to ship.

On August 29, 2005, SAL filed a motion to reconsider. *See* Fed. R. Civ. P. 59(e). SAL argued that the court's factual error regarding the contract's itemization of components was the "fundamental premise" for the entire judgment and rendered it incorrect. SAL also faulted the district court for failing to rule on the second-generation sign issue. Dualite, in response, conceded that the district court had made a factual error in interpreting the pricing in the contracts, but argued that the judgment should be left undisturbed.

In its ruling on SAL's motion to reconsider, the district court reversed its previous judgment, granted the motion for summary judgment in its entirety, and dismissed the case with prejudice. *Dualite Sales & Serv., Inc. v. Moran Foods, Inc.*, No. 04-13 (S.D. Ohio Sep. 26, 2005) [hereinafter Second D. Ct. Op.]. For the second time, however, the district court failed to mention Dualite's claims involving the second-generation signs. The court noted that "its earlier judgment was based on a fundamental misapprehension of the identity of the pieces which were itemized on the first page of the agreements." It went on to state:

> The purchase agreement is unambiguous in that it nowhere [obligates] Save-a-Lot
> to purchase any components or sub-components used to manufacture the finished
> signs under any circumstances. Thus, while the Court understands that the
> purpose of the agreement was for Dualite to manufacture custom-made signs for
> Save-a-Lot, we are compelled to agree with Save-a-Lot that an interpretation
> requiring Save-a-Lot to purchase components, subcomponents, parts, subparts,
> raw materials, or the "bits and pieces" which comprise completed signs would
> improperly import terms into the agreement.

*Id.* at 7. We disagree with the district court and reverse.

**II**

We review the district court's grant of summary judgment de novo. *Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a grant of summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The party opposing summary judgment cannot rest on its pleadings or allegations. To prevail, it must present material evidence in support of its allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"Questions of contract interpretation, such as those that formed the basis of the District Court's grant of partial summary judgment, generally are considered to be questions of law subject to de novo review." *Meridian Leasing, Inc. v. Assoc. Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005) (quoting *Campbell v. Potash Corp. of Sask., Inc.*, 238 F.3d 792, 797 (6th Cir. 2001). *See also Saunders v. Mortensen*, 801 N.E.2d 452, 454 (Ohio 2004) (holding that, in Ohio, the construction of a written contract is a matter of law reviewed de novo).

**III**

A

In this case, we are guided by the rules of contract interpretation as decided by the Supreme Court of Ohio. "The purpose of contract construction is to effectuate the intent of the parties. The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987) (citations omitted). "[C]ommon, undefined words appearing in a written instrument 'will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument.'" *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915–16 (Ohio 2004) (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 148 (Ohio 1978)). "A contract must be construed with reference to its subject matter, nature, and object or purpose." *Bennett v. Heidinger*, 507 N.E.2d 1162, 1164 (Ohio Ct. App. 1986) (citing *McBride v. Prudential Ins. Co. of Am.*, 72 N.E.2d 98, 99 (Ohio 1947)). Ambiguity exists where "the language is capable of two reasonable, but conflicting interpretations." *Wells v. Am. Elec. Power Co.*, 548 N.E.2d 995, 997 (Ohio Ct. App. 1988). "It is generally the role of the finder of fact to resolve ambiguity. However, where the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1262 (Ohio 2003) (citations omitted). *See also NILAC Intern. Mktg. Grp. v. Ameritech Servs., Inc.*, 362 F.3d 354, 359 (6th Cir. 2004) (resorting to interpretation against the drafter only if the factfinder is unable to determine the intent of the parties).

We believe it is obvious that the intent of the parties upon entering the contracts was for Dualite to provide a ready source of custom-manufactured signs so long as SAL would commit to future purchases within a designated range of quantities. The bargain provides SAL with signs more quickly than if each individual sign was ordered alone and at a more favorable price. Under the minimum/maximum contracts, Dualite could take advantage of economies of scale and lower the per-unit cost of each sign by manufacturing several at a time. Uncontroverted evidence in the record demonstrates that "materials can be purchased in larger quantities at the same time (at reduced prices) and all the parts of the signs can be manufactured at the same time (which reduces labor costs)." The disputed contract language provides SAL with these advantages but burdens them with the responsibility for cancelling the order at the right time: when Dualite's inventories match SAL's remaining demand. This information could only be know by SAL. The bargain places the risk of a sign change on the party with the most information about it, namely SAL.

The record corroborates that this was SAL's intent as late as April 13, 2000, when it entered into a final minimum/maximum contract, only months before changing its logo in August of that same year. Mitch Armer, SAL's representative and signatory on several of the contracts, makes this admission in his sworn testimony:

> Q: You see that it has a 5 slash 25. Did you have an understanding as to what that meant when you signed this?
> A: I believe I did.
> Q: What was that understanding?
> A: Minimum of 5 signs and a maximum of 25 signs. Signs being face and/or face and cabinet.

Q: Did you understand by that that Save-A-Lot had committed to purchase at least five of those signs and/or sign faces?
*[multiple objections by counsel are omitted]*

Q: Mr Armer, did you understand that by signing this document, you had committed that Save-A-Lot would purchase a minimum of five of this size of face and/or face and cabinet?[1]

A: Yes.

The district court recognized this in its first opinion when it noted that

> it makes little sense that Dualite would obligate itself to keep on hand a minimum supply of speciality parts needed to manufacture signs to Save-a-Lot's specifications, but then be stuck with a supply of parts in cannot use if Save-a-Lot would decide to make a unilateral decision to change its logo. Thus, it is logical that the purchase agreement was written, and should be interpreted, to place the risk and the cost associated with a logo change on the purchaser and not on the seller.

First D. Ct. Op. at 12. Nothing in the court's later opinion contradicts or supersedes this clear and reasonable interpretation of the parties' intentions.

Nevertheless, SAL argues that a reversal here would expose them to unlimited liability and require them to purchase whatever raw materials Dualite might choose to foist upon them. For this reason, the argument continues, it would be error to allow Dualite's action to proceed because SAL would never have accepted a contract assigning to them unlimited liability. Although counsel for SAL did not explain this reasoning to us completely at oral argument, we remain unconvinced by it. To the contrary, SAL's liability is clearly delineated on the face of the contracts: at minimum, the unit price of a designated sign multiplied by 90% of the minimum quantity, and at maximum, the unit price multiplied by 110% of the maximum quantity. We find

---

[1]The document under discussion is equally clear that the minimum/maximum program applied to signs and that all replacement logo faces were to be supplied as required.

nothing in the disputed language that might subject SAL, as counsel argues, to any liability of an

unknown order.

The district court's opinion ruling upon the motion for reconsideration relied on the fact

the final product was not fully assembled.

> The purchase agreement is unambiguous in that it nowhere [obligates] Save-a-Lot
> to purchase any components or sub-components used to manufacture the finished
> signs under any circumstances. Thus, while the Court understands that the
> purpose of the agreement was for Dualite to manufacture custom-made signs for
> Save-a-Lot, we are compelled to agree with Save-a-Lot that an interpretation
> requiring Save-a-Lot to purchase components, subcomponents, parts, subparts,
> raw materials, or the "bits and pieces" which comprise completed signs would
> improperly import terms into the agreement.

Second D. Ct. Op. at 7–8. Under this set of assumptions, the products at issue here are not signs

until the precise moment when the final rivet has been secured. In SAL's opinion, therefore,

Dualite's inventories consist only of "raw materials" and "bits and pieces," items they cannot be

contractually obligated to purchase. We disagree. It is elemental that a contract for the purchase

of raw materials is valid. *See, e.g.*, Commodity Exchange Act, 7 U.S.C. § 2 (giving the

Commodity Futures Trading Commission jurisdiction to regulate "transactions involving

contracts of sale of a commodity for future delivery."). If a sign, as a factual matter, is merely a

collection of raw materials with an additional person-day of labor added, the contracts remain

valid. A sign cannot be made from thin air, it must be assembled from its component parts. The

point at which those parts become a sign is a question to be determined by the factfinder, not one

to be debated in metaphysical terms as a matter of law.

Contrary to SAL's assertions, Dualite's asserted damages are not a "windfall." Rather, they are a reasonable measure of its expectation interest, supported by the record. In other words, the claimed damages are an award that is "designed to secure for [it] the benefit of the bargain that [it] made by awarding a sum of money that will place [it] in as good a position as [it] would have occupied had the contract[s] been performed." 24 Williston on Contracts § 64:2 (4th ed. 2002). Assuming that the prices of the included raw materials have been relatively static, Dualite may not recover their price from SAL if they can be disposed of on the open market. "It is a cardinal rule of contracts that an injured party is under a duty to mitigate its damages and may not recover those damages which it could have reasonably avoided." *Wilson v. Kreusch*, 675 N.E.2d 571, 574 (Ohio Ct. App. 1996). A "plaintiff simply cannot recover those damages that it could have avoided. Damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered either as not having been caused by the defendant's wrong or as not being chargeable against the defendant." *Williston*, at § 64:27. Application of this basic rule allays the district court's fears of importing terms into the agreement because raw materials and commodity parts may be sold to Dualite's other customers with minimal effort. Consequently, their cost cannot be recovered by Dualite. However, there is no evidence in this record, aside from SAL's legal assertions, that *any* of the materials in question are appropriately fungible, making this an issue improper for summary disposition.

The use of the words "sign" and "inventory" in the contracts does not alter our interpretation of the parties' intentions. In the context of a contract for the purchase of signs, even SAL agreed at oral argument that signs are purchased from the seller's inventory. Given

their ordinary meaning, the words of the contract communicate several unobjectionable concepts: sign sellers keep inventories of signs; when a sign is in inventory it is "in stock;" and signs in inventory are stored. None of this results in "manifest absurdity." *See Petro*, 820 N.E.2d at 915.

Lastly, if we were to agree with SAL's theory of the case, we would be sanctioning economic waste. Savvy future parties in Dualite's shoes will certainly complete assembly of their signs to guarantee payment, even though they know the buyer has no intention of accepting delivery of or using the signs. Simply put, we will not apply a rule in this case that sanctions unreasonable economic waste. *See Ohio Valley Bank v. Copley*, 699 N.E.2d 540, 548 (Ohio Ct. App. 1997); *Jacob & Youngs, Inc. v. Kent*, 129 N.E. 889, 891 (N.Y. 1921).

B

The district court dismissed this case without discussing Dualite's breach of contract claim based upon the seventeen second-generation signs. Where a district court fails to rule on a claim, we generally remand for consideration below. *See Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 552 (6th Cir. 2004) (court of appeals cannot make factual determinations nor is it possible to review the court below without some explanation); *Clark v. Chubb Group of Ins. Cos.*, 337 F.3d 687, 694, n.4 (6th Cir. 2003) (remand is proper where a district court has not ruled on the issue). *See also United States v. Richardson*, 437 F.3d 550, 553–54 (6th Cir. 2006) (recognizing the principle of meaningful appellate review and a district court's obligation to explain to the parties and the reviewing court its reasons for a particular judgment).

In some instances, it is proper for an appeals court to rule on a determination only implicitly considered by the court below.

> We are reluctant to attempt review and either to reject or uphold conclusions of law or findings of fact on dispositive issues when they can only be deduced as implicit in a resulting judgment. The ordinarily preferred course, equally reluctantly taken, is to remand for first instance determination of the issue by the district court. Nevertheless, where, as here, the issue is narrow and specific, and the implicit determination clear beyond any doubt, we may yet review to avoid the expensive alternative of a remand for a practically assured *pro forma* express determination conforming to that one necessarily implicit in the judgment.

*Brown v. Baltimore & Ohio R.R. Co.*, 805 F.2d 1133, 1141 (4th Cir. 1986) (citation omitted).

*See also Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc.*, 959 F.2d 606, 615 (6th Cir. 1992) (citing *Brown, supra*) ("Where a district court has implicitly decided a narrow and specific issue, we will review the findings of fact and conclusions of law which necessarily support that decision, rather than remand for a certain express determination.").

In this case, the district court initially denied SAL's motion for summary judgment on the breach of contract claims. Subsequently, the court reversed its position and granted the motion. The sole cause of that reversal, according to the district court, was that it had misunderstood terms in the contracts that would only apply to the first generation of signs. Dualite's breach of contract claim regarding the second-generation signs does not necessarily hinge on the same contractual language. Yet, that claim too was dismissed, without any change in the court's factual determination. Therefore, any implicit determination of the unaddressed contractual question is necessarily ambiguous. In addition, the questions of judicial economy motivating the court in *Brown, supra*, are not applicable here because we have already remanded the case back to the district court on the first issue.

### IV

No. 05-4348
Dualite Sales v. Moran Foods

For all these reasons, we **REVERSE** the judgment of the district court and **REMAND**

for further proceedings consistent with this opinion.