**[Cite as *Wilson v. Canup*, 2025-Ohio-2443.]**

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

KEITH WILSON,
      :
      :     Case No. 24CA2
    Plaintiff-Appellee,     :
      :
    v.     :     <u>DECISION AND JUDGMENT</u>
      :     <u>ENTRY</u>
LEE CANUP,     :
      :
    Defendant-Appellant.     :     **RELEASED: 07/02/2025**
      :

<u>APPEARANCES:</u>

Lee Canup, Scottown, Ohio, Appellant, pro se.

Wilkin, J.

{¶1} Appellant, Lee Canup, is appealing the Lawrence County Municipal Court's decision granting appellee, Keith Wilson's,[1] small claims complaint for payment of $1,300 for the unpaid balance he is owed. The trial court granted Wilson's request after a full hearing and determined that there was a verbal contract for Canup to pay Wilson $2,500 for his labor to install a new liner in her pool.

{¶2} Canup presents three separate assignments of error challenging the trial court's factual determination that: (1) there was a meeting of the minds regarding the terms of the verbal contract; (2) Wilson substantially completed the work as agreed upon; and (3) Wilson completed the work despite occurrences outside of his control that affected Canup's use of the pool.

---

[1] Appellee has not filed an appellate brief and is not otherwise participating on appeal.

{¶3} We overrule each of Canup's assignments of error and find that the trial court's factual determinations were supported by the evidence presented at trial. There was a verbal contract between Wilson and Canup for Wilson to install a new liner for her pool and the labor cost was $2,500. Canup only paid Wilson $1,200. We find that Wilson substantially completed the work and Canup owed him the remainder of the balance being $1,300. We therefore, affirm the trial court's judgment entry in favor of Wilson.

PROCEDURAL BACKGROUND AND FACTS

{¶4} In the fall of 2021, Canup purchased her home that has a salt-water pool. According to Wilson, such pools have a salt-cell that converts the salt water into chlorine. Thus, when you add salt to the pool water, the salt mixes with the water and that mixture of water and salt will then go through the salt-cell and be converted into chlorine.

{¶5} In December 2021, Canup hired Wilson to close the pool and he did. For that service, she paid him $250 and also the cost of purchasing a pool cover of $1,650. In the summer of 2022, she hired Wilson again but this time to open her pool. At that time, according to her testimony, she paid Wilson $900 to re-attach the liner at certain spots around the pool. There were no issues in 2022 in opening and closing Canup's pool and she paid Wilson the agreed upon amounts in full.

{¶6} In April 2023, Canup again hired Wilson to open her pool. When opening the pool, Wilson noticed that there was water under the pool's liner. He informed Canup and they agreed for Wilson to drain the water and she paid him

$500 for his labor. However, upon further inspection, it was determined that the water that was under the liner was too much to where the water pulled the liner loose. Wilson recommended removing the liner and installing a new liner. Canup approved the liner replacement. Wilson placed the order for the liner and Canup paid him for the material cost.

{¶7} At the end of June, Wilson installed the new liner, and a few days later, he added 15 bags of salt, 4 gallons of shock and a bottle of algaecide in the pool. In early July, after Canup started the pool up, she reached out to Wilson and informed him that the pool computer indicates that the salt level was zero. The computer also indicated that the salt-cell should be inspected. Wilson responded and informed her that the salt-cell probably needed cleaning, but he did not have the proper acid cleaner that would be required. Wilson also told Canup that he will return and add five bags of salt into the pool, which he did.

{¶8} A few days later, Canup reached out again and informed Wilson that the salt readout is 500 and still indicates that the salt level is low and again to inspect the salt-cell. The 500-salt level is low as the normal range should be between 2800 to 3200. He again informed her that the issue may be her salt-cell, and Canup, at this point, took a sample of her pool water to get tested. On July 14, the pool computer indicated the level was 1000, but at the testing facility, the readout was 813. Wilson again suggested that the issue may be her salt-cell not working properly.

{¶9} On July 4 Wilson provided Canup an invoice specifically stating that he is owed "$2,500 for labor and salt and new gaskets and face plates." And

then on July 10, Wilson requested payment as his truck payment was coming due. Canup placed a check in the amount of $1,200 in her mailbox for Wilson, which he picked up. But then on July 20, when Wilson requested the remainder of his payment, Canup in turn, sent Wilson a letter with a set of documents explaining that she only owed him $161.98 and enclosed a check in that amount. Wilson rejected the check, consulted an attorney who sent Canup a letter on behalf of Wilson demanding the remaining balance of $1,300. After approximately two months, Wilson filed his small claims complaint requesting the full payment of $1,300, the filing fee of $84, and the attorney fee of $125.

{¶10} During her testimony at the hearing, Canup presented a packet of exhibits that included, among other documents, images of the pool liner separating in certain locations, images of text message exchanges between them, and the letter she sent Wilson with a copy of the $161.98 check. Canup elaborated on the reasoning for her letter and how she did not agree to pay Wilson $2,500 for the labor to install the pool liner. In her mind, she was paying Wilson for the liner, and opening the pool, which included making sure that the water/salt/chlorine ratios were at the proper levels so she could swim in the pool. Instead, the levels were off and she and her friends got a yeast infection. The packet of exhibits also included a table created by Canup based on her home security cameras of the days and hours Wilson was at her house:

Security Cameras Captured [Wilson] or Other Associates on the Property. All 15-minute water level checks were rounded up to 1 hour.

| Date | Hours on Property (rounding up) | # of Workers Present |
|------|------|------|
| 06/19/2023 | 4 | X2 |
| 06/24/2023 | 1 | X1 |
| 06/25/2023 | 6 | X2 |
| 06/27/2023 | 1 | X1 |
| 06/28/2023 | 1 | X1 |
| 06/29/2023 | 1 | X1 |
| 06/30/2023 | 1 | X2 |
| 07/01/2023 | 1 | X1 |
| 07/05/2023 | 1 | X1 |
| 07/07/2023 | 1 | X1 |
| 07/12/2023 | 1 | X1 |
|  | 19 hours captured |  |

**{¶11}** Based on the hours and what she believes is a reasonable hourly rate, Canup testified that she previously paid Wilson $1,730.47 for labor and based on her calculation, she only owed him an additional $161.98.

**{¶12}** After hearing the testimony and admission of Wilson and Canup's exhibits, the trial court took the matter under advisement and adjourned.  The trial court issued an order granting in part Wilson's request:

> After reviewing the testimony and the exhibits the court finds that the plaintiff is entitled to payment for the job that the parties contracted for.  He did the work and was entitled to $2500.00 for the work.  After considering the payment made by defendant in the amount of $1200.00 the plaintiff is therefore owed $1300.00 from defendant.
> The plaintiff performed the work.  Occurrences happened that were out of his control.  Pools inherently cause problems, this pool is no exception.  The defendant is not entitled to a reduction of the amount owed to the plaintiff.
> The plaintiff is not entitled to reimbursement for the money he paid his lawyer.  The plaintiff shall pay his own court cost.

It is therefore ordered that the defendant pay the plaintiff $1300.00.

**{¶13}** It is from this entry that Canup appeals.

ASSIGNMENTS OF ERROR

I.   THE TRIAL COURT ERRED IN FINDING THAT THE PARTIES HAD A MEETING OF THE MINDS WITH RESPECT TO THE TERMS AND CONDITIONS OF THE WORK TO BE PERFORMED.

II.  IF AN ENFORCEABLE CONTRACT EXISTED, THE TRIAL COURT ERRED IN FINDING THAT WILSON SUBSTANTIALLY PERFOMED.

III. THE COURT ERRED WHEN IT FOUND THAT WILSON WAS EXCUSED FROM PERFORMING BASED ON CONDITIONS OUTSIDE OF WILSON'S CONTROL.

**{¶14}** Under the first assignment of error, Canup argues that both she and Wilson testified and that in her testimony, she was clear from the beginning that she did not agree with Wilson's assertion that she was to pay him $2,500 for just installing the lining of the pool.  To the contrary, it was her understanding that Wilson was going to reopen the pool which did not occur here.  Based on her testimony, Canup maintains that there can be no meeting of the minds in regard to the contract as asserted by Wilson.

**{¶15}** Under the second assignment of error, Canup argues that the trial court's factual conclusion that Wilson completed the work is contrary to the evidence she presented.  He did not complete any work as evidenced by the failed salt/water ratio testing and that she was the one who ended the contract and properly deducted the damages and additional expenses she incurred.

**{¶16}** Under the final assignment of error, Canup argues that the trial

court's finding that Wilson was excused from performing his job because of the weather is pure speculation. She presented evidence as an exhibit that demonstrated that the rainfall did not affect the salt level.

## I. Law and analysis

{¶17} We will address Canup's three assignments of error together because they attack the trial court's factual findings relating to the same verbal contract involving Canup's pool.

## A. Law

{¶18} Generally, "[l]egal issues involving contract interpretation are subject to a de novo standard of review." *S.P. Drilling Servs., Inc. v. Cooper's Excavating, L.L.C.*, 2019-Ohio-55, ¶ 14 (4th Dist.). But that is not the standard when reviewing a trial court's factual determinations, and in that case,

great deference is given to the trial court's factual findings supporting its legal conclusions. *Id.* Thus, the trial court's decision will be upheld "if some competent, credible evidence exists to support them." *Id.* Accordingly, "we do not review the trial court's factual findings under an abuse of discretion standard, but rather, we look to see if those facts and the resulting judgment are both supported by the weight of the evidence." *Id.*, citing *Patton v. Patton*, 2001-Ohio-2599 (4th Dist.). " '[W]e are required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate factual conclusions.' " *Bumgarner v. Bumgarner*, 2010-Ohio-1894, ¶ 20 (4th Dist.), quoting *Bugg v. Fancher*, 2007-Ohio-2019, ¶ 9 (4th

Dist.).  Thus, we

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In weighing the evidence, we must presume that the findings of the trier of fact are correct, and if the evidence is susceptible of more than one construction, as a reviewing court, we must give it that interpretation that is consistent with the verdict or finding and judgment. *See id.* at ¶ 21.

*Maddali v. Haverkamp*, 2022-Ohio-3826, ¶ 18 (1st Dist.).

**{¶19}** Contract formation requires an offer, acceptance, consideration, and mutual assent between two or more parties with the legal capacity to act.  *See Kostelnik v. Helper*, 2002-Ohio-2985, ¶ 16.  A contract can be verbal and may be enforceable provided there is "sufficient particularity to form a binding contract[.]" *Id.* at ¶ 15.  And the terms of an oral contract may be determined from " 'words, deeds, acts, and silence of the parties.' "  *Id.*, quoting *Rutledge v. Hoffman*, 81 Ohio App. 85, 75 N.E.2d 608 (12th Dist.1947).  "The burden of proof on one seeking to enforce an oral contract requires that party to prove the existence of the contract by clear and convincing evidence."  *Bumgarner* at ¶ 20, citing *Nofzinger v. Blood*, 2003-Ohio1406, ¶ 53 (6th Dist.).

> Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶20}** For a contract to be enforceable, there must be a "meeting of the

minds" as to the essential terms of the agreement, i.e., the essential terms of the agreement must be " 'reasonably certain and clear' " and mutually understood by the parties. *Kostelnik* at ¶ 16-17, quoting *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376 (1997).

> To have a meeting of the minds, " 'there must be a definite offer on one side and an acceptance on the other.' " *Turoczy Bonding Co. v. Mitchell,* 2018-Ohio-3173, 118 N.E.3d 439, ¶ 18 (8th Dist.), quoting *Garrison v. Daytonian Hotel*, 105 Ohio App.3d 322, 325, 663 N.E.2d 1316 (2d Dist.1995). Furthermore, "[t]he relevant inquiry is the manifestation of intent of the parties as seen through the eyes of a reasonable observer, rather than the subjective intention of the parties." *Bennett v. Heidinger*, 30 Ohio App.3d 267, 268, 507 N.E.2d 1162 (8th Dist.1986).

*Widok v. Est. of Wolf*, 2020-Ohio-5178, ¶ 56 (8th Dist.).

**{¶21}** And "[s]ubstantial compliance is a concept that allows a party to enforce a contract where the party seeking enforcement has substantially complied with its terms. A nominal or trifling breach is excused." *Sims v. Anderson*, 2015-Ohio-2727, ¶ 17 (4th Dist.).

## B. Analysis

**{¶22}** We first observe that deference is given to the findings of the trial court as "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Moreover, a trier of fact is free to believe all, part, or none of the testimony of any witness who appears before it." *Dills v. Hogsett*, 2025-Ohio-1496, ¶ 15 (4th Dist.).

**{¶23}** And in this case, based on the trial court's conclusions, it found

Wilson's testimony to be credible.  And Wilson's testimony is supported by the admitted exhibits.

{¶24} The admitted exhibits, which consisted of the text messages between Wilson and Canup, demonstrate that in May, Canup approved ordering the new liner for her pool.  She said go ahead and order it after she was informed by Wilson that the cost for the liner is $2,984.38, which is the quote he received.  Based on her approval, Wilson ordered the liner and picked it up in June.

{¶25} After receiving the liner, Wilson on June 25 went and installed the 20x40 feet liner in the pool.  The installation date corresponds with Canup's table establishing that on that date, Wilson and an associate were at her home for six hours.  Moreover, during their exchanges, Wilson asked what is the money tally so far as he is not good with tracking the money.  To which Canup responded: "500 for getting the water out of behind it and the chemicals to clean it to get it open and running.  And 2500 for labor of installation of liner fixing the poolbase, and fixing the coping that was coming off."

{¶26} Canup also testified that in 2022, she paid Wilson $900 to have the liner re-attached.  Thus, it is reasonable that she would pay $2,500 for the full installation of the liner that is 20x40 feet in size.  Wilson installed the liner and after being informed by Canup that some areas of the liner were separating, he testified that he returned on July 12 and reconnected the liner and fixed the coping.  His testimony is corroborated by text messages between them and also the admitted table by Canup in which she noted that on July 12, Wilson was at her property for an hour.  Canup claimed that some areas of the liner are still

detached, but she did not state whether she gave Wilson the opportunity to return and fix those areas. There is no evidence showing that he declined to return and address any issues with the liner.

{¶27} After reviewing the testimonies and the admitted evidence, we ascertain that Wilson and Canup formed a friendship and Wilson was doing odd jobs for her. We believe that Wilson did not intend to charge Canup in the summer of 2023 for the labor to add the salt bags to her pool. However, it seems his good deed was mistreated by Canup in believing that he was going to make sure her salt/chlorine ratios were at safe levels for her to swim in the pool. But there is nothing in the record to support the finding that he agreed to do that.

{¶28} What the record demonstrates is that a verbal contract was established in which Canup agreed to pay Wilson $2,500 for his labor to install a new liner in her pool. Wilson installed the liner. Canup partially paid him for his labor and he is owed the remainder of his fee.

{¶29} Finally, we wish to address Canup's argument in which she has an issue with the trial court's conclusion "[o]ccurrences happened that were out of his control." Canup maintains that the trial court's finding is contradicted by her exhibit demonstrating that rainfall was minimal and could not have affected the Ph/salt level in her pool as Wilson claimed. But if we review the trial court's complete finding, he continues by stating: "Pools inherently cause problems, this pool is no exception. The defendant is not entitled to a reduction of the amount owed to the plaintiff." We believe the trial court's finding is not related to the rainfall or the weather, but rather, to the pool's computerized equipment. The

record demonstrates that there was an issue with Canup's salt-cell computerized system.  This is evidenced by Canup's own testimony in which she herself took her pool water to be tested, and there was a discrepancy.  Her unit read the salt level at 1000, but the testing lab found it to be only 813.  Therefore, we find that the trial court's conclusion is supported by the record.

CONCLUSION

{¶30} We overrule Canup's assignments of error and affirm the trial court's decision finding in favor of Wilson and ordering Canup to pay him $1,300.

**JUDGMENT AFFIRMED.**

<u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Municipal Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J.:  Concur in Judgment and Opinion.


For the Court,


BY: _____
Kristy S. Wilkin, Judge


**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**